THE STATE OF KANSAS v. BLANCHE BOIES.

No. 13,670. (74 Pac. 630.)

SYLLABUS BY THE COURT.

MALICIOUS TRESPASS—*Construction of the Word "Malicious."* The word "malicious," as used in section 107 of the crimes act (Gen. Stat. 1901, § 2100), directed against the unlawful destruction of the property of another, in view of the provisions of section 112 (Gen. Stat. 1901, § 2105), is to receive the construction usually given it in criminal statutes, and in a prosecution thereunder it is no defense to show that the defendant was not actuated by any actual ill will toward the owner or any other person.

Appeal from Shawnee district court; Z. T. HAZEN, judge. Opinion filed December 12, 1903. Affirmed.

C. C. *Coleman*, attorney-general, and *Otis E. Hungate*, county attorney, for The State.

*Garver & Larimer, D. H. Branaman*, and *J. M. Dumenil*, for appellant.

The opinion of the court was delivered by

MASON, J.: Blanche Boies was convicted of the offense commonly known as malicious trespass, defined in section 107 of the crimes act (Gen. Stat. 1901, § 2100), and appeals. This section reads:

"Every person who shall wilfully, unlawfully and maliciously break, destroy or injure the door or' window of any dwelling-house, shop, store or other house or building, or sever therefrom or from any gate, fence or enclosure, or any part thereof, any material of which it is formed, or sever from the freehold any produce thereof, or anything attached thereto, or shall pull down, injure or destroy any gate, post, railing or fence, or any part thereof, or cut down, lop, girdle or other-wise injure or destroy any fruit or ornamental or shade tree, being the property of another, shall on conviction be adjudged guilty of a misdemeanor."

The information charged:

"That Blanche Boies, at the county of Shawnee, in the state of Kansas aforesaid, and within the jurisdiction of this court, on the 14th day of February, A. D. 1903, did then and there wilfully, unlawfully and maliciously break, destroy and injure the doors and windows to a certain building of one Sophia Hogeboom and in the possession of H. A. Uterman, the said building being used as a cigar store of H. A. Uterman, located at the place and number commonly called number 833 Kansas avenue street, city of Topeka, county and state aforesaid, being lot number 285 on Kansas avenue street in said city."

The evidence of the state showed that defendant had broken with an ax the plate glass in the doors

and windows of the front room on the ground floor of
the building described in the information.    In behalf
of the defendant, an offer was made to show that the.
premises had been for some time in use as a place
where intoxicating liquors were sold in violation of
law, without molestation from the officers or others,
and that this fact was known to the defendant.   This
offer was made not for the purpose of justifying the
act, but as tending to contradict the allegation that it
was malicious.    The offer was refused.   Defendant
also asked and was denied an instruction that she
could not be convicted if she believed at the time of
the act complained of that the premises were used as
a place where intoxicating liquors were sold in viola-
tion of law and acted with the purpose to interrupt.
such violation, her design and motive being directed
against such illegal business, she having no ill will
against the owner or possessor of the property, or de-
sign to destroy property merely for the purpose of its
destruction.

By these means and in other ways the defendant
raises a question concerning the meaning to be given
to the word "malicious" in the statute quoted.    As
ordinarily employed in criminal statutes it is the
equivalent of "wrongfully, intentionally, and without
just cause or excuse."    But as used in many statutes
directed against the unlawful destruction of property,
it is held to have a restricted meaning peculiar to
such statutes, implying that the act to which it re-
lates must have resulted from actual ill will or
revenge.   The state contends for the former construc-
tion ; the defendant for the latter.    This is the sole
issue presented by the appeal.    If the former con-
struction be adopted the conviction must be upheld ;
if the latter, it must be set aside.

The special meaning noted had its origin in England in prosecutions under what is known as the "black act" (9 Geo. I, ch. 22), enacted in 1722, so called because it was designed to repress the depredations of bands of marauders calling themselves "blacks," some of them being disguised by blacking their faces. The act provided :

"That if any person or persons . . . shall unlawfully and maliciously kill, maim or wound any cattle, or cut down or otherwise destroy any trees planted in any avenue, or growing in any garden, orchard or plantation, for ornament, shelter or profit, . . . every person so offending, being thereof lawfully convicted, shall be adjudged guilty of felony, and shall suffer death as in cases of felony, without benefit of clergy."

It was held that, in prosecutions under this act for injuries to cattle, "in order to bring an offender within this law, the malice must be directed against the owner of the cattle, and not merely against the animal itself." (2 East's Pleas of the Crown, 1072.) Mr. Bishop, in his work on Statutory Crimes (§ 433), says that he has not been able to discern the reason for this holding in the opinions of the English courts. East (page 1071) attributed it to the language of the preamble of the act. This recited that "several ill-designing and disorderly persons have of late associated themselves under the name of blacks," etc. In this he merely adopted a conclusion he had already reached with more plausibility in the case of another statute, of which he says (page 1063) :

. "The offense herein described seems. by the preamble to be pointed at such as commit it from a motive of malice to the owner of the property ; for it recites that 'malicious and envious persons, being men of evil and perverse dispositions,' etc., *and minding the hurt, undoing and impoverishment of true and faithful*

*subjects*, have of late invented a new, damnable kind of
vice, etc., and damnifying of the king's true subjects,
etc., in committing such and such offenses."

In *Brown v. The State*, 26 Ohio St. 176, it was sug-
gested that the peculiar construction of the language
of the "black act" was adopted because of the dispro-
portionate severity of the punishment, the judges
naturally inclining to an interpretation that would
tend to save the life of the defendant. Whatever the
reason for the rule, it became the settled law of Eng-
land in cases arising under that act and later enact-
ments of the same general character. In the United
States most statutes prescribing a penalty for the ma-
licious destruction of property are sufficiently like
those of England to warrant the inference that they
were modeled upon them, and for this reason they
have generally, but not always, been given the same
construction. ( 2 Bish. Cr. Law, § 996, note 10 ; 19
A. & E. Encycl. of L., 2d ed., 641, 646 ; note to *State
v. Robinson*, 32 Am. Dec. 661, 666 ; *Nutt v. The State*,
19 Tex. 340 ; *State v. Gilligan*, 23 R. I. 400, 50 Atl.
844.)

Upon the considerations thus far presented, the issue
might be resolved in favor of the defendant by hold-
ing that our statute was adopted directly or indirectly
from England, after it had received the construction
for which defendant contends, and that therefore the
court is bound to accept such construction ; or in favor
of the state, by holding that the Kansas statute is not
so closely related to those of England as to make the
English decisions controlling, and that such decisions
ought not to be followed because based on reasons that
no longer exist, even if they were originally sufficient.
But it is not necessary to choose between these con-
flicting theories, either of which might be supported

by plausible argument.  The section of the statute already quoted must be interpreted in the light of another section (Crimes Act, § 112; Gen. Stat. 1901, § 2105), reading as follows :

"Every punishment and forfeiture imposed on any person maliciously committing any offense prohibited by the provisions of either of the last eight preceding sections shall equally apply and be in force, whether the offense shall be committed from malice conceived against the owner of the property, in respect to which it shall be committed, or otherwise."

This section originated in England in 1827, as part of an act consolidating and amending the laws relating to malicious injuries to property. ( 7 and 8 Geo. IV, ch. 30, § 25.)   It was adopted by Missouri from England in 1835, and by Kansas from Missouri in 1855.   It was manifestly designed for the very purpose of changing the earlier English rule already discussed.   Its effect, upon first consideration, giving full force to its express terms, seems to be to do away altogether with the exceptional meaning of the word "malicious" and to restore to it the general meaning given it in other statutes.   But it is argued in behalf of appellant that the words "or otherwise," as used in this section, are equivalent to "or against some other person," the effect of the change being to relieve the prosecution from proving malice against the owner, but not from proving malice against some person.   The whole matter to be determined narrows down to the question whether this contention is sound.

The decisions in this country throw little light on the question.   The appellant cites *State v. Underwood,* 37 Mo. 225, and *State of Missouri v. Graham,* 46 id. 490. In the Underwood case the defendant was charged with maliciously pulling down a house belonging to one Wood.   He offered to show that he acted on au-

thority derived from Wood's wife, who had occupied it for some months alone. This offer was rejected and the supreme court held the rejection error, because under the circumstances the defendant might innocently have supposed that his authority was sufficient. In the Graham case the defendant was charged with maliciously killing a hog belonging to one Huskey. He offered to show acts tending to prove that he had authority to kill other hogs and killed Huskey's by mistake. The offer was rejected because the acts sought to be shown took place after the killing. The supreme court held the rejection error, saying that it was obvious that if defendant was simply pursuing his authority and killing what he supposed to be the hogs covered by it he was guilty of no offense. Neither case mentions the section of the statute now under consideration ; nor does either attribute to the word "malicious" any other than its general meaning. The appellee cites *State v. Hambleton*, 22 Mo. 452, which merely decides that in an indictment for the malicious killing of an animal it is not necessary to charge malice against the owner. But the opinion in the latter case cites with approval the cases of *Regina v. Tivey*, 1 C. & K. 704 ( Den. C. C. 64), to which further reference will be made later, and *Rex v. Salmon*, Russ. & Ry. C. C. 26, decided in 1802, which held that under an indictment for maliciously setting fire to a haystack it was no defense to show that the prisoner had no ill will toward the owner, the facts of the case showing malice toward another person. Our attention has been directed to no other American case that arose under a statute having a provision similar to that under discussion.

The many cases arising in England prior to 1827, and in this country in jurisdictions where the English

rule as it existed prior to that time has not been changed by statute, manifestly have no bearing on the question here involved. The earliest reported English case arising under the new statute appears to be *Regina v. Tivey*, supra, decided in 1844. Tivey was indicted for having maliciously wounded a mare. No malice was shown toward any one. It was argued for the prisoner that malice must be shown toward the owner, but the argument was based upon a claim that the section corresponding to section 112 of our crimes act had been repealed. For the prosecution it was argued that under that section malice against the owner need not be shown, or, if the section were repealed, that general malice was sufficient. The point was reserved for the consideration of the fifteen judges, who held the conviction was right. The claim that the section had been repealed was evidently not well founded, so that the ruling was plainly made under the section referred to. While the discussion was in terms directed to the question whether or not it was necessary to prove malice against the *owner*, this resulted naturally from the fact that under the circumstances of the case there could have been no malice against any other person. The real question was whether it was necessary to show malice against any person, since it was expressly stated that no malice against any one was shown.

In *The Queen v. Pembliton*, L. R. 2 C. C. 119, the defendant had been fighting with persons in the street and threw a stone at them which struck and broke a plate-glass window. The jury returned a verdict of guilty, but found that he did not intend to break the window. On review the conviction was set aside. The chief justice, Lord Coleridge, said that the expression "or otherwise," in the provision making it

immaterial whether the offense had been committed from malice against the owner of the property or otherwise, meant from malice against the owner or some one not the owner.  But he added:

"It seems to me that what is intended by the statute is a wilful doing of an intentional act.  Without saying that if the case had been left to them in a different way the conviction could not have been supported, if, on these facts, the jury had come to a conclusion that the prisoner was reckless of the consequence of his act, and might reasonably have expected that it would result in breaking the window, it is sufficient to say that the jury have expressly found the contrary."

Another judge, Blackburn, said:

"Here the statute says that the act must be unlawful and malicious, and malice may be defined to be 'where any person wilfully does an act injurious to another without lawful excuse.'  Can this man be considered, on the case submitted to us, as having wilfully broken a pane of glass?  The jury might perhaps have found on this evidence that the act was malicious, because they might have found that the prisoner knew that the natural consequence of his act would be to break the glass, and although that was not his wish, yet that he was reckless whether he did it or not; but the jury have not so found, and I think it is impossible to say in this case that the prisoner has maliciously done an act which he did not intend to do."

A third judge, Lush, said:

"On these findings we have no alternative.  The jury might have found otherwise, but taking this finding I cannot say that there was an intent, either actual or constructive, and 'malicious' certainly must be taken to imply an intention, either actual or constructive."

The two remaining judges concurred in the result but made no statement of reasons.  The effect of the

reasoning given, notwithstanding the remark of the chief justice, seems to be that malice against an individual, or what is called actual malice, need not be shown. In *The Queen v. Welch*, 1 Q. B. D. 23, decided in 1875, the prisoner was convicted upon a charge of maliciously killing a mare. There was no evidence that he was actuated by ill will toward the owner of the mare or spite toward the mare, or by any motive except the gratification of his own depraved taste. It was held on review, following *The Queen v. Pembliton*, supra, that there was malice sufficient to sustain the conviction.

Upon the authority of these decisions, it is said in the American and English Encyclopedia of Law (2d ed., vol. 19, p. 643, note 1) :

"Under the express provisions of the later English statutes it is immaterial whether or not the offense is committed from malice against the owner of the property ; the wilful doing of an intentional act is sufficient to warrant a conviction."

We therefore conclude that under the authorities the effect of section 112 of the crimes act is to take from the word "malicious" the specific meaning that had been attributed to it in laws against the destruction of property and restore to it the usual sense in which it is used in criminal statutes. We also approve this view upon principle. Prior to the English act of 1827 the phrase "malice against the owner" seems to have been used by the courts and writers even more often in contradistinction to malice against the property than in contradistinction to malice against other persons, and the fair and natural inference is that both distinctions were in view when the statute was passed, making the malice sufficient whether conceived against the owner "or otherwise."

It follows that there was no error in the instruction complained of and that the evidence offered and rejected had no tendency to establish a valid defense.

The judgment is affirmed.

All the Justices concurring.