The State v. Ross.

---

THE STATE OF KANSAS v. M. H. ROSS.

No. 15,476. (94 Pac. 270.)

SYLLABUS BY THE COURT.

1. INFORMATION—*Third Degree Arson—Allegation of Malice.* In an information charging arson in the third degree it is not necessary to allege that the burning was malicious, where the charge is that it was done wilfully, wrongfully, unlawfully, and feloniously.

2. CRIMINAL LAW—*Instructions.* Where the general charge of the court fairly presents the case to the jury a party who desires an instruction upon some particular question should request it, and cannot predicate error upon the omission if he has not done so.

3. —— *Cross-examination of Witnesses.* The latitude allowed on cross-examination must depend on the circumstances of the case, and necessarily rests largely in the discretion of the trial court; and upon a review of the evidence in this case it is held that the court did not exceed a proper discretion in this respect.

4. —— *Arson—Evidence and Verdict.* The evidence in this case examined and held to be sufficient· to sustain the verdict.

Error from Montgomery district court; THOMAS J. FLANNELLY, judge. Opinion filed February 8, 1908. Affirmed. Opinion denying a petition for a rehearing filed March 18, 1908.

*Fred S. Jackson,* attorney-general, and *Thomas E. Wagstaff,* for The State.

*Howard A. Scott, Joseph G. Waters,* and *John C. Waters,* for appellant.

The opinion ·of the court was delivered by

BENSON, J.: The appellant was convicted of arson in the third degree. He complains of the insufficiency of the information, that the court erred in the admission of evidence and in the giving of instructions, and challenges the sufficiency of the evidence to prove his guilt.

The information charges that the defendant "did then and there wilfully, wrongfully, unlawfully, knowingly, and feloniously, in the night-time, set fire to, and cause to be burned, the livery-barn belonging to one B. H. Toothman." It is argued that this information is defective because it does not contain an allegation that the burning was malicious. The statutory definition of arson in the third degree is: "Every person who shall wilfully set fire to or burn . . . shall on conviction be adjudged guilty of arson in the third degree." (Gen. Stat. 1901, § 2046.) The information is sufficient. (*The State v. Jessup,* 42 Kan. 422, 22 Pac. 627; *The State v. Douglas,* 53 Kan. 669, 37 Pac. 172; *The*

*State v. Shinn,* 63 Kan. 638, 66 Pac. 650; *The State v. Fooks,* 29 Kan. 425.)

Nor did the court err in failing to define "malice," although arson at the common law is the malicious burning of the house of another. If the act was done wilfully, unlawfully, and feloniously, it was done maliciously. "Maliciously" is the equivalent of "wrongfully, intentionally, and without just cause or excuse," as ordinarily employed in criminal statutes. (*The State v. Boies,* 68 Kan. 167, 74 Pac. 630.) The court properly instructed the jury that "wilfully" meant the doing of the act purposely and intentionally, not accidentally, and stated all the elements of the crime.

A witness was allowed to testify that the appellant told him that he had burned a hotel, and also a dwelling-house. The same witness testified that the appellant proposed to him to burn the barn in question, and the theory of the prosecution was that the relation of previous conversations showing how like criminal purposes had been carried out was competent to characterize and lead up to the proposal for burning the barn in question. The witness was fully examined and cross-examined as to both conversations, thus giving the jury an opportunity to find what connection, if any, there was between them, and to determine the real significance of the proposal made to the witness and its bearing upon the issue.

A witness called by the appellant, whom he had known nearly all his lifetime, was asked whether the appellant had ever said anything to him about burning the barn. The state objected, but the witness was allowed to answer that he had not. Thereupon the question was asked: "Did he ever at any time say anything to you in regard to burning any other property?" The answer was: "No, sir." He further testified that he had never talked with Defenbaugh, appellant's codefendant, about such burning before it

occurred.    On cross-examination the following questions were asked and answers given:

"Ques. You say you never had any conversation with Mr. Ross about the buildings that had been burned down there in Havana? Ans. No, sir.

"Q. How many different buildings have been burned there? A. Well, now, I will have to count; I can't give it accurate. I will say there was about eight or nine; I don't know just how many.

"Q. About eight or nine in that little village? A. Yes, sir. In what time do you mean—all the time that I have known it?

"Q. That is what I was asking you. During the last five years, how many have you heard of being burned? A. Well, I guess that number would about cover it; I don't know.

"Q. About nine have been burned there inside of the last five years? A. Yes, sir.

"Q. And you never have had any conversation with Ross about any of them? A. No, sir; I have not.

"Q. What buildings have been burned there? A. Mr. Pendleton's warehouse and store, and Mr. Fralic's hotel, and Mr. Pendleton's barn, and I forget this man's name down there now—he had a store burned, and Joe Nelsch's shop, and Ross Blair's store, and Mr. King's house, and the Chance hotel.

"Q. Two hotels and two or three different stores; each one of them was burned at separate times, was it? A. No, a lot of them burned in a string one night.

"Q. A lot of them. How many do you call a lot? A. Three or four of them. There was a blacksmith shop—

"Q. What else? A. Well, there was what was known as the—I can't call the man's name now; started in there. He works in this barn here. And burnt Joe Nelsch's shop and burnt the blacksmith shop and on down the line; and then Mr. Pendleton's store burned, and then the warehouse, and the brick building added to the store building and a drug store.

"Q. How store and warehouse? A. Yes, sir.

"Q. In the same fire? A. No, I don't think it was; I am not positive. It was none of my business, and I don't just remember.

"Q. You don't remember? A. No, I think Mr. Pen-

dleton's store and warehouse burned at the same time; I am not positive.

"Q. Where was the store located with reference to the warehouse?  A. Well, the store was west of the warehouse.

"Q. How far west?  A. I don't know.  About as far as from here to this—

"Q. You say they were burned the same night?  A. Yes, sir.

"Q. Were these two hotels burned the same night? A. No, sir.

"Q. They were different fires?  A. I don't remember just how those buildings all burned, but I think there was two or three burned at a time, or three or four, something like that.

"Q. How many different fires have there been set? Have all of the fires burned buildings there?  A. Now, then, I haven't got them down.  I don't take dates.  I haven't lived in town; but there has been several."

Objections that this was not proper cross-examination and that the testimony was incompetent were made and overruled.  It must be remembered that a witness for the state had testified that the appellant had admitted to him that he had burned some of the buildings referred to in these questions, and it should be further noted that this witness had just been asked on direct examination whether the appellant had ever said anything to him about burning other buildings.  This cross-examination called his attention to specific fires, and led to the inquiry whether the witness had talked with the appellant about any of them.  Having stated generally that he had had no conversation about any fires, it was permissible on cross-examination to call his attention in this manner to particular instances.  While the cross-examination was searching and pushed to great length on this collateral matter, we cannot say that the court exceeded a proper discretion in admitting it.  The question on direct examination which provoked this line of cross-examination was of doubtful propriety; but, having secured a favorable ruling thereon, the appellant cannot complain that the recol-

lection and credibility of the witness were pretty thoroughly tested. In such a situation the latitude allowed in cross-examination must depend on the circumstances of the case, and necessarily rests largely in the discretion of the trial court. (*Bassett v. Glass,* 65 Kan. 500, 70 Pac. 336; *The State v. Pfefferle,* 36 Kan. 90, 12 Pac. 406.)

Complaint is also made that the court allowed conversations with the codefendant, Defenbaugh, to be testified to. As Defenbaugh was on trial for the same offense the testimony could not have been excluded, and in the instructions the court stated to the jury that such testimony was incompetent as against the other defendant unless they found that the two defendants were acting together, pursuant to a conspiracy, when such conversation occurred—stating at length the rule in such cases.

Complaint is also made that two of the defendant's witnesses were arrested upon the order of the court in the presence of the jury, at the close of defendant's evidence, to his prejudice. The testimony tended to show misconduct on the part of the witnesses, and such probable participation in an effort to defeat justice in the case as to induce the court to take this action. While such arrest, when necessary to the ends of justice, ought to be made in the absence of the jury, we are unable to say from the record that there was an abuse of judicial discretion or that it prejudiced the substantial rights of the appellant.

It is insisted that upon all the evidence there was no proof that the fire was of criminal origin, and that the evidence was insufficient to sustain the verdict. The testimony is quite voluminous. There was the fact of the fire, and the negative testimony of the employees and others about the barn. There was also proof showing the presence of appellant and Defenbaugh on the road and near the scene of the fire late that night. Added to this and other attendant circumstances were the positive statements of witnesses of the threats of

the appellant, and of the admissions of Defenbaugh. True, the jury did not convict Defenbaugh, but there was evidence tending to show the guilt of the appellant that did not apply to his codefendant.   One witness testified that appellant asked him whether his father's barn would not rent better if Toothman's barn was out of the way, and whether if it was burned Toothman would leave town, and whether it would be a good way to get rid of it to put a match in the window in the manger.   This was two months before the fire.   Another witness testified that appellant said he knew a plan to get the Toothman barn out of the way, and asked the witness what he would give to have it put out of the way; that he knew a fellow that would do the work; and wanted to know what he (the witness) would do if he should see the barn on fire in the night. There was also the testimony of the witness, before referred to, who swore that appellant proposed to him that if he would burn the barn he would surrender a note he held against him.   Testimony was also given tending to show the payment by appellant to a witness of $25 to testify to a supposed conversation implicating another party in the crime.   The defendant Defenbaugh was with appellant late on the night of the fire, and near the place.   The explanation of the appellant of his presence on the road that night was of a doubtful nature.   His conversation with a witness after the fire also indicated his knowledge of its origin. The testimony, if it is to be believed, shows a singular recklessness, not only of conduct but of conversations, threats and admissions, and challenges careful scrutiny; but its weight and credibility were for the jury. If true, it certainly supports the verdict.   Having been found to be true by the jury, and approved by the trial court, its sufficiency cannot be successfully controverted here.

Criticism is made because the instructions did not charge the jury that the presumption was that the fire was not criminal and that appellant could not be con-

victed on his threats alone, and that there was an omission of some other negative propositions. No requests for further instructions were· made, and those given fairly covered all matters of law necessary for. the information of the jury. (Crim. Code, § 236; Gen. Stat. 1901, § 5681.) Where the general charge fairly presents the case to the jury a party who desires an instruction upon some particular question should request it, and cannot be heard to complain of the omission if he has not done so. (*The State v. Pfefferle,* 36 Kan. 90, 12 Pac. 406.)

Finding no error in the record prejudicial to the substantial rights of the appellant, the judgment is affirmed.

---

OPINION DENYING A PETITION FOR A REHEARING.

The opinion of the court was delivered by

BENSON, J.: On a petition for a rehearing we are asked to reconsider the alleged error in the arrest of the two witnesses. Such an arrest appears to have been considered an error in *Burke v. The State,* 66 Ga. 157. In *People v. Wolcott,* 51 Mich. 612, 17 N. W. 78, an arrest of a witness for the defendant was referred to as "theatrical," in view of the attendant circumstances, and was criticized; but the court did not decide that the arrest alone was sufficient ground for a new trial. These authorities merit, and have received, careful consideration, but we are constrained to follow the decision of this court in *The State v. Morrison,* 67 Kan. 144, 72 Pac. 554, and to hold that upon the facts disclosed in this record the arrest was not sufficient cause to set aside the verdict.

The petition is denied.