No. 20,437.

THE STATE OF KANSAS, *Appellee,* v. GEORGE B. ALLEN, *Appellant.*

SYLLABUS BY THE COURT.

1. HOMICIDE—*Trial—Letters from Deceased to Defendant's Daughter Properly Admitted in Evidence.* In a prosecution for murder the defense was justifiable homicide. The defendant's daughter, a young woman under seventeen years of age, testified that she met the deceased by appointment at a place near a public road in the daytime, and had been talking to him for about an hour previous to the homicide; that at the instant her father fired the shot which killed the deceased, she was sitting in a buggy and deceased was standing on the ground beside her with one arm about her neck and the other about her ankles attempting to drag her from the buggy and to commit a criminal assault upon her. She further testified that more than a year previous to the homicide when deceased was working for her father on a ranch where she lived, he had once criminally assaulted her and at another time had attempted to do so, and that she had informed her father of these occurrences, and that deceased was discharged from her father's employ, that she bitterly hated the deceased because of his treatment of her and never had wanted to see him again, and would not have wanted to speak to him if she had met him. *Held,* that for the purpose of affecting the credibility of the witness, it was not error to admit in evidence letters written by her to the deceased

The State v. Allen.

after he quit her father's employ, containing expressions of friendship and affection and tending strongly to impeach her testimony as to the relations between herself and the deceased.

2. HOMICIDE—*Trial—Written Statement Signed by Defendant's Daughter—Properly Admitted on Her Cross-examination.* For the same reasons it is held that it was proper to admit in cross-examination a written statement signed by the same witness in the presence of the county attorney and others a day or two after the homicide, in which she stated that at the time the shot was fired the deceased was standing at one side of the buggy talking, with his left hand on the back of the buggy or around her shoulder and the other hand resting on the buggy bed.

3. HOMICIDE—*Regular Array of Jurors Discharged—Duty of Judge to Select Another Jury.* Where in a criminal prosecution the court sustains the defendant's challenge to the array and discharges the panel because the original names in the jury box have not been properly selected from the assessment rolls, it is the duty of the judge, under section 4624 of the General Statutes of 1909, to select a sufficient number of jurors for the term and to name those selected, and it is not error to refuse to summon the township trustees and require them to select the lists of jurors. (*The State v. Schmidt*, 74 Kan. 627, 87 Pac. 742.)

4. HOMICIDE—*Sufficient Information.* An information which charges that the defendant "did then and there unlawfully, feloniously, willfully, deliberately, with premeditation and with malice aforethought and with a deadly weapon, to wit, a gun, then and there loaded with powder and ball, assault and shoot at one Alfred Tucker, and did then and there with the deadly weapon aforesaid and in the manner and with the weapon aforesaid shoot and kill him, the said Alfred Tucker, contrary to the form of the statute in such case made and provided and against the peace and dignity of the state of Kansas," sufficiently informs the defendant that the charge against him is murder in the first degree, and the omission to employ the words *purposely* and *maliciously* in describing the act of shooting and killing is held in this case not such a defect or imperfection as tends to the prejudice of the substantial rights of the defendant upon the merits.

5. SAME—*Indorsing Additional Names on Information.* In this case it is held that there was no abuse of discretion in permitting the indorsement of certain names of witnesses upon the information immediately before the trial.

6. SAME—*Trial—Certain Evidence of Deceased's General Reputation—Properly Excluded.* In this case it is held that there was no error in the exclusion of testimony offered for the purpose of showing the general reputation of deceased where he formerly resided in another state as to his being immoral and unchaste, and also to show that he had contracted there a common-law marriage and that a child had

been born of such marriage, information respecting these matters not having reached the defendant until after the homicide, and the facts not tending in any way to establish a defense nor to affect the situation or appearances at the time of the homicide.

7. SAME—*Trial—Instructions in the Several Degrees of Crime Included in Charge for Murder.* Counsel for defendant requested the court not to submit any instructions except upon the law of murder in the first degree. Of its own motion the court instructed upon the law of murder in the first and second degrees and the jury returned a verdict of murder in the second degree. *Held,* that since the evidence shows beyond question that defendant was guilty of murder in the first or second degree or that he was innocent, there was no error in the omission of the court to instruct the jury with reference to the lesser degrees.

8. SAME—*Trial—Cross-examination of Witnesses—Ordinarily Within Judicial Discretion.* The rule that the extent to which cross-examination shall be allowed is determined by the circumstances of the case and rests largely in the discretion of the trial court followed, and *held,* that the defendant's right of cross-examination was not unduly restricted, and held further, that defendant suffered no prejudice from rulings on the admission of evidence offered by the state.

Appeal from Meade district court; LITTLETON M. DAY, judge. Opinion filed October 7, 1916. Affirmed.

*J. P. McLaughlin,* of Osage City, *R. W. Griggs, F. M. Davis,* both of Meade, *C. E. Cooper, John Madden,* both of Parsons, and *Wallace Hughes,* of Guymon, Okla., for the appellant.

*S. M. Brewster,* attorney-general, *Frank S. Sullivan,* county attorney, and *John W. Davis,* of Greensburg, for the appellee.

The opinion of the court was delivered by

PORTER, J.: George B. Allen was charged with murder in the first degree, in killing Alfred Tucker on the 5th day of October, 1914, in Meade county. He was found guilty of murder in the second degree. The verdict was approved by the trial court, and from the judgment of conviction he appeals.

Alfred Tucker had been employed on the defendant's ranch, in Meade county, from the spring of 1912 till the latter part of August, 1913, when he was discharged or left the employ of defendant and went to Clark county where he worked at different places near Englewood. While living at the ranch he became acquainted with defendant's daughter, Tina Allen, who was then about sixteen years of age. After he went to Clark

county he and Tina Allen corresponded at frequent and regular intervals, the correspondence indicating that their friendship had ripened into a strong attachment. The letters received by the deceased from Tina Allen were preserved by him and were found among his effects; some of them were offered in evidence.

The day before the homicide Alfred Tucker had assisted in driving a bunch of horses from Englewood to a farm near Meade. He had received a letter from Tina Allen in which she agreed to meet him at the railroad bridge on the afternoon of October 5. The appointment was carried out. The place where they met is about a mile from the city of Meade, and on or close by a much-traveled public highway. They were seen there in conversation by a number of passers-by, among whom was Con Wasson, who waved his hand and called to them, and they returned his salute. He went into town and told his brother, Glen Wasson, that he had seen Tucker and Tina Allen out by the railroad bridge. At this time the defendant was cutting feed for Glen Wasson at a place east of Meade, and about three-quarters of a mile from the railroad bridge. Glen Wasson went to the field where Allen was and informed him that his daughter and Tucker were out by the railroad bridge, that they had their horse tied out where everybody could see it, and said that he did not think it looked well for a young lady to be out there with a young man. There was testimony to the effect that Allen became very angry, turned white and said he would kill Tucker, referring to him by a vile name, and that he at once got down from his binder, left it standing in the field, secured his horse and buggy and drove away. Although he was then about a mile southeast of the railroad bridge, he drove east a distance of one mile, turned north and drove one mile where he crossed the public highway running east and west which passed within a short distance of the railroad bridge where his daughter and Tucker were. He did not take this east-and-west road, but drove another mile north where he turned west, continuing for two miles, and then south along a private road to his residence about a quarter of a mile distant. There he requested one of his employees to water his horse, and to tie it in front of the house. He secured two guns, one of them a .38 caliber Winchester rifle, loaded them and put them in his buggy. He was at this time about three

quarters of a mile north of the railroad bridge. He first went to the portico of his house and looked down in the direction of the bridge to see if he could discover his daughter and Tucker. He then got into his buggy and drove back north to the public road, then west and south almost three miles, crossed the railroad track and turned east along the public highway close by the railroad track.

From where he turned east to the bridge a person traveling on the highway is concealed from the view of a person on the opposite side of the railroad, because of the high embankment. The testimony offered by the state showed that Alfred Tucker was killed by a .38 caliber rifle bullet which entered his back six inches below the point of his left shoulder and came out on the opposite side. The testimony of the state tended also to show that the defendant approached the deceased under concealment of the embankment until he reached a point under the bridge, and from that position fired the shot which resulted in Tucker's death. Immediately after the homicide he returned to Meade and informed the coroner that there was a man down by the railroad bridge who was injured and he requested the coroner and another person to go out there. These persons went immediately to the place and found Tucker's body lying in the roadway a distance of 128 feet from the center of the bridge. The evidence showed that death had been instantaneous. There was found in a pocket of the deceased the letter from Tina Allen making the appointment to meet him there. No weapons of any kind were found on or about the body.

The defense was justifiable homicide; the killing was not denied, but the defendant contended first, that the homicide was committed in self-defense, and secondly, to prevent the commission of a felonious assault upon his daughter. The defendant testified that in August, 1913, he had discharged the deceased from his employ because of having learned first from another employee, and subsequently from his daughter, that Tucker had attempted to ravish his daughter; that after the deceased had left his employ a friend had informed him that Tucker had said in substance that defendant had driven him off, but he was coming back whenever he got good and ready, and that if the defendant stuck his nose in his business the defendant would have to shoot quicker than he did. The de-

fendant further testified that when he reached the railroad bridge he got out of his buggy, took the rifle and went under the bridge; that he saw Tina in the buggy and Tucker standing by the side of it; that Tucker appeared to be trying to pull Tina from the buggy; that one arm was on her shoulder or neck and the other in the region of her knees, and she was pushing back; that he tried to call out to them, but choked and could not speak; that just at this instant Tucker turned his face toward the defendant and defendant saw an expression that was beastly and startled, and that Tucker's right hand dropped towards his hip, and the defendant immediately fired one shot. As before stated, the testimony showed that no weapon was found on the body of the deceased or near it.

The principal witness for the defendant in support of the other theory was the daughter, Tina Allen, who testified to an alleged assault made upon her in the year 1913 by Alfred Tucker, and that she communicated the fact to her father. One of the main contentions in the case arises from the admission on her cross-examination of certain letters written by her to Alfred Tucker covering a period of more than a year after the deceased had left her father's employ. The sole purpose of the introduction of the letters was to affect her credibility as a witness. She testified that she had destroyed the letters received by her from Tucker, but she identified the letters to him shown to her on cross-examination, and admitted they were hers. She had testified that she bitterly hated the deceased because of the assault he had committed upon her, that she never had wanted to see him again, and would not have wanted to speak to him if she had met him. It is contended that the court erred in admittng these letters in evidence. Only portions of them were read to the jury and the court instructed that they were admitted for the purpose only of affecting the credibility of the witness. Their admission was eminently proper. The letters were filled with expressions of friendship and endearment, and tended strongly to impeach the statement of the witness that the deceased had committed an assault upon her as she testified or that there had ever been any ill-feeling between them. It may be said of the letters, too, that they are not in any way discreditable to the young lady. While they abound in expressions of affection and endearment and of

good humor and friendship, they contain no suggestion of anything improper, and are on the contrary consistent with the purest kind of friendship and love for the deceased. Inasmuch as the defense of justifiable homicide was grounded to a very large extent upon the testimony of the daughter, the jury might well have believed that her story on the witness stand in relation to the alleged misconduct of the deceased toward her was fabricated for the purpose of the defense. She had testified that just before she heard the report of the gun the deceased was trying to pull her out of the buggy and she was holding back so that he could not; that one of his hands was around her shoulder and neck and the other around her ankles. A day or two after the homicide she made the following written statement:

"I met Alfred Tucker down near the railroad bridge by appointment a little after three o'clock Monday afternon, October 5, 1914, some time between four and five o'clock to the best of my judgment. I was sitting in the buggy north of the railroad bridge about where the creek bed is. Alfred was standing on the east side of the buggy, one hand, his left hand, on the back of the buggy, or it may have been on my shoulder, talking. The other hand rested on the buggy bed. The buggy was facing the northeast. I heard a shot and Alfred fell. I looked and saw my father standing under the railroad bridge. He called to me to come to him and I did. His horse and buggy were standing in the road south of the bridge, facing the east. Father got in the buggy with me and we drove to town, his horse following. Alfred had not mistreated me in any way that day nor attempted to mistreat me, but he had before when he was working for father some time in August, 1913."

The foregoing statement was made at her home in the presence of the county attorney, his deputy and Mrs. Lucy Bunch, and at a time when Tina's father was in jail. It has been repeatedly held that on the cross-examination of a witness whose testimony may be affected by friendship or enmity toward either party, great latitude of cross-examination is permissible. As a general rule, the party against whom a witness is produced has a right to show everything which may in the slightest degree affect his credibility. (*The State v. Collins,* 33 Kan. 77, 5 Pac. 368.) The extent to which a witness may be cross-examined on collateral and irrelevant matters rests in the sound discretion of the trial court. (*The State v. Pfefferle,* 36 Kan. 90, 12 Pac. 406.) There was no abuse of discretion here. The letters written to the deceased and the written

statement to the county attorney were admissible on cross-examination for the purpose of discrediting the story told by the daughter.

Obviously the jury were not impressed with the story of the daughter to the effect that the deceased either had been before the defendant arrived upon the scene, or was at the time defendant fired the shot, attempting to commit a criminal assault. The correspondence between the parties, and all the circumstances, rendered her story highly improbable. The prearranged lovers' meeting at a place on or near a much-traveled highway, the length of time they were at the bridge, which must have been considerably more than an hour, because the young lady testified that she left school at Meade at three o'clock and at once drove to the place, and the evidence, indicate that the defendant came to the place of the homicide between four and five o'clock; all these facts and circumstances and the friendly correspondence between the daughter and the deceased were undoubtedly given weight by the jury. The jury doubtless took into consideration the fact that the defendant could have gone to the place where he was informed his daughter and Tucker were by traveling a distance of less than one mile, and that instead of doing this he drove to his home by a circuitous route, secured and loaded his rifle, and that there he was less than three-quarters of a mile from the place where Tucker and Tina were, but instead of traveling that distance he deliberately drove the remainder of the more than nine-mile circuit for the purpose of concealing his approach and enabling him to come within shooting distance of Tucker without the latter's knowledge. The claim that he shot in self-defense under the impression that Tucker was about to shoot him was contradicted by the location of the wound, the circumstances testified to by his daughter at the trial to the effect that Tucker was standing with his back toward the bridge, as well as by the written statement made by the daughter to the county attorney, which was that Tucker was standing with his right hand resting on the buggy bed when she heard the crack of the rifle.

There is a complaint that the jury was not selected according to law. The court sustained the defendant's challenge to the array, and discharged the panel because the original names in

the jury box had not been selected from the assessment rolls of the previous year. Thereupon the judge-proceeded to select a jury for the term, following the provisions of section 4624 of the General Statutes of 1909, which requires the judge to select a sufficient number of jurors for the term and to name those selected, whenever for any cause the lists have been improperly returned. It is contended that the township trustees should have been summoned and required to select the lists of jurors. Aside from the fact that such a method would have been cumbersome and the cause of unnecessary delay, the procedure which the court followed is authorized by the section of the statute just cited. It was so decided in the case of *The State v. Schmidt,* 74 Kan. 627, 87 Pac. 742. In the opinion in that case the distinction between the situation here and that involved in *The State v. Edwards,* 64 Kan. 455, 67 Pac. 834, cited in support of defendant's contention, was pointed out. Moreover, there is nothing to indicate that defendant suffered any prejudice by the manner in which the jurors were selected.

It is complained that the information does not charge a public offense. There was no motion to quash, but the point was raised by an objection to the introduction of testimony. The information charges that the defendant "did then and there unlawfully, feloniously, wilfully, deliberately, with premeditation and with malice aforethought and with a deadly weapon, to wit, a gun, then and there loaded with powder and ball, shoot at one Alfred Tucker, and did then and there with the deadly weapon aforesaid, and in the manner and with the weapon aforesaid shoot and kill him, the said Alfred Tucker, contrary to the 'form of the statute in such case made and provided, and against the peace and dignity of the state of Kansas." It is insisted that the information does not charge that the killing was done purposely and maliciously. We think that by a fair construction of the language used the information charges that the killing was unlawful, felonious, willful, deliberate, premeditated and with malice. The omission to repeat the words *purposely* and *maliciously* in describing the act of shooting and killing might have been regarded as fatal when courts were more concerned in the intricate search in all criminal reviews for technical grounds of reversal, but much progress has been made in recent years in the way of disregarding such technicalities. Section 110 of the criminal code

expressly forbids us to quash or set aside an indictment or information for certain defects, among which is enumerated: "*Seventh.* For any other defect or imperfection which does not tend to the prejudice of the substantial rights of the defendant upon the merits," and section 293 of the criminal code declares that "on an appeal, the court must give judgment without regard to technical errors or defects, or to exceptions which do not affect the substantial rights of the parties." It would lengthen this opinion unnecessarily to attempt to cite all the cases in which the foregoing provisions have been applied and judgments of conviction affirmed. Under section 110, *supra,* may be cited *Fort Scott v. Dunkerton,* 78 Kan. 189, 192, 96 Pac. 50; *The State v. Bland,* 91 Kan. 160, 164, 136 Pac. 947; and under section 293 may be cited the recent case of *The State v. Marshall,* 95 Kan. 628, 632, 148 Pac. 675.

Over the objections of defendant the court permitted the county attorney to indorse the names of three witnesses upon the information immediately before the trial. The usual complaint is made that this was error. The whole record discloses that defendant was not prejudiced in the slightest by the indorsement of these names. The two Carliles testified to matters which the defendant admitted and about which there was no dispute. J. D. Tucker, the father of the deceased, testified to a few matters of no special importance.

We find no error in the rulings sustaining objections to questions asked on cross-examination of witness J. D. Tucker. The objections were properly sustained. There was ground to sustain them because the questions were not proper cross-examination and related to incidents which could only have occurred long prior to the homicide while deceased was living in another state.

Willard Tucker was permitted to testify that deceased came with him and helped drive the horses from Englewood to Meade county. There was no error in permitting the state to offer this testimony to rebut the suggestion that deceased was there only for immoral or other unlawful purposes.

A number of objections have been made as to testimony of certain other witnesses as to facts which the defendant himself admitted, but there could not have been any prejudice resulting from the admission of the testimony.

It is contended that the venue was not proved, but the coroner testified that the body was found in Meade county.

Complaint is made of the exclusion of certain testimony offered for the purpose of showing the general reputation of deceased in the community where he formerly resided in Louisiana, as to his being immoral and unchaste, and also to show that he had contracted there a common-law marriage with one Mary Moncrieff and that a child had been born of such marriage. When an objection to this character of testimony was sustained, an offer was made to show that information of deceased's former reputation in Louisiana and of the facts in reference to his relations with Mary Moncrieff had been communicated to the defendant prior to the homicide. An affidavit in behalf of defendant filed in support of an application for a continuance of the cause is made a part of the record and shows that the information respecting these matters did not in fact reach the defendant until after the homicide. In determining, therefore, whether defendant was prejudiced by the ruling we may disregard the offer to show that he had the information prior to October 5, 1914. Some of the testimony was excluded because it violates the rule that reputation and character can not be shown by evidence of specific acts of wrongdoing; and we think it was all irrelevant because it tended in no way to establish a defense, nor to affect the situation, condition or appearances at the time the act of homicide was committed.

We discover no error in the instructions. Counsel for defendant requested the court not to submit any instructions except upon the law of murder in the first degree. Of its own motion the court, however, instructed upon the law of murder in the first and second degrees, and, as stated, the jury returned a verdict of murder in the second degree. It was urged on the motion for a new trial, and is insisted upon here, that the court erred in failing to instruct on the degrees of manslaughter, assault with intent to kill, and other degrees of assault. The defendant was represented by able counsel and ought to be held bound by the solemn request made by them in his behalf as to the instruction of degrees of the crime unless it can be said that it was the manifest duty of the court under the evidence to instruct upon the lesser degrees. We think the evidence shows beyond question that the defendant was guilty of murder in the first or second degree, or that he was innocent.

His own testimony takes out of the case the question of manslaughter, because it shows that the killing was intentional, and done either in self-defense or in defense of his daughter. In some respects the case is similar to that of *The State v. Yarborough*, 39 Kan. 581, 18 Pac. 474, where it was held that the defendant was not prejudiced by a failure to instruct as to the several degrees of manslaughter, in view of the evidence which showed "so much thought, contrivance and design were betrayed by the defendant in the mode of possessing himself of the revolver with which he killed the deceased; and so much deliberation and express malice on the part of the defendant was established." (p. 596.) In that case the trial court was requested, and refused, to instruct upon the law of manslaughter. No instruction upon the law of manslaughter was asked in this case, but on the contrary defendant's counsel requested the court not to so instruct.

. In the case of *The State v. Newton*, 74 Kan. 561, 87 Pac. 757, it is recognized to be "the duty of the trial court to define and instruct in reference to all lower degrees of the crime of which there is any reasonable theory of guilt under the evidence." (Syl. ¶ 2.) In that case the court had instructed as to the only degree which the evidence naturally suggested as probable, and the jury returned a verdict of guilty in that degree; the verdict was abundantly supported by the evidence, and it was held not to be "reversible error for the court to omit to define any lower degree of the crime or to instruct in reference to it unless its attention is challenged thereto by a request for such instruction." (Syl. ¶ 3.)

In *The State v. Curtis*, 93 Kan. 743, 145 Pac. 858, it was said:

"But where the evidence shows beyond question that a defendant is either guilty of murder in the first degree or innocent, it is unnecessary upon the general charge of murder in the first degree to instruct the jury upon any other degree." (p. 745.)

(See, also, *The State v. McAnarney*, 70 Kan. 679, 685, 79 Pac. 137.)

It is always the rule that the evidence must be looked to, to determine whether instructions should be given as to the lesser degrees. We find nothing in the present case calling for such an instruction even though it had been requested.

. It is complained that in a number of instances the trial court unduly restricted the defendant's right of cross-examination, but we are unable to discover any ground for this contention. The extent to which cross-examination shall be allowed depends always on the circumstances of the case and rests largely in the discretion of the trial court. (*The State v. Ross*, 77 Kan. 341, 346, 94 Pac. 270, and cases cited.) We have no hesitation in saying that the trial court did not abuse its discretion in the present case in any of the instances complained of.

We discover no error which would justify us in reversing the judgment of the trial court and accordingly that judgment is affirmed.