THE STATE OF KANSAS v. CLYDE MOORE.

No. 13,491.    (73 Pac. 905.)

SYLLABUS BY THE COURT.

1. MURDER—*Competent Circumstantial Evidence.* Upon the trial of an action for murder, circumstantial evidence tending to prove that a person other than the defendant participated in the crime, and involving the conduct of such person exhibited immediately after its commission and under its apparent stimulus, may be introduced if it tends to prove the character of the homicide and the motive with which it was committed, and does not in itself show the defendant's connection therewith.

2. ———— *Technical Error in Exclusion of Testimony.* A technical error committed by the trial court in refusing to permit a question to be answered as not cross-examination will not be sufficient to cause a reversal of a judgment entered upon a verdict of murder in the second degree, when from an examination of the record it appears that the substantial rights of the defendant were not prejudiced.

3. ———— *Instructions as to Second Degree.* If, upon the trial of a defendant informed against for murder in the first degree, circumstantial evidence relied on for conviction be susceptible of interpretation in such manner as to exclude deliberation and premeditation, an instruction upon the law of murder in the second degree should be given.

Appeal from Cowley district court; W. T. McBRIDE, judge. Opinion filed October 10, 1903. Affirmed.

*C. C. Coleman*, attorney-general, *J. E. Torrance*, and *S. C. Bloss*, for The State.

*C. T. Atkinson*, for appellant.

The opinion of the court was delivered by

BURCH, J.: On the afternoon of April 18, 1901, a team of horses drawing a farm wagon and galloping along a country road in Cowley county, a short distance west of Winfield, without a driver, was stopped, and the wagon was found to contain the dead body of

C. L. Wiltberger, a resident of Winfield, the owner of the team and wagon and the owner of a farm in the immediate vicinity.   He was lying face upward in the bottom of the wagon-box, near its front end, with a bullet-hole through his head.   The character of the wound disclosed that he had been shot from behind with a weapon of large caliber, and that death must have followed instantly.   His pocketbook, his money, consisting of a few silver and nickel coins, and his keys were gone from his pockets.   He had been marketing wheat from his farm to Winfield and had left that city less than an hour before in possession of some checks he had received for his produce, which were also missing.   The scene of the tragedy was located at a secluded spot in the bottom of a ravine, between the place where the team was stopped and Winfield, by drops of blood and large pools of blood on the ground.   The position of these marks indicated that the team had been stopped twice, at places a short distance apart, at the time of the homicide.

On the evening of the day preceding this shocking catastrophe, two boys, Charles Betts, aged thirteen and still wearing knee trousers, and Clyde Moore, who was not yet seventeen years old, left their homes in Arkansas City for Winfield.   By pawning a bicycle they had obtained some money which, when divided, amounted to about $2.15 for each one, and Charles Betts took with him a large 44-caliber Colt's revolver belonging to his father.   Being unable to conceal so formidable a weapon upon his childish person, it was given to Clyde.   They arrived at Winfield at night. The next morning they left the lodging-house where they had slept and during the forenoon strolled about the city, loitered along the tracks and upon the grounds of various railroads entering it, conversed with a tramp

and with another individual they met, and finally, near a railroad junction on the outskirts of town, shot at a mark with the revolver. In the course of their perambulations they twice crossed Ninth avenue, a street in Winfield, which Mr. Wiltberger that day traveled twice in each direction before his death, and from which extended the country road upon which he was killed.

Late in the afternoon Clyde climbed into a box car of a 'Frisco railroad-train at Winfield, and went home. Near five o'clock in the evening Charles appeared at the station of Hackney, on the Santa Fe railroad, between Arkansas City and Winfield, and tried to purchase a ticket to St. Joseph, Mo. Later he took a train at Hackney for Arkansas City, arriving there after night, when, without going home, he went to Clyde's house and inquired for him. When seen at Hackney and on the train his shoes and clothing were muddy, as they were when he finally reached his home. Once home, a state of nervous excitement relaxed in an uncontrollable precipitation of tears.

In the immediate vicinity of the scene of the murder two lines of footprints of different size were discovered. They led away from the fateful place in different directions and portions of their courses appeared to have been made by running feet. These telltale tracks were traced through many meanderings. Sometimes after wide detours the two trails seemed constrained toward each other, as if the fleeing persons who made them had expected to meet; and in one instance one line of tracks led an apparently anxious search far down one side of the Walnut river, and then returned, while the other lay unresponsive across the stream. Finally, the larger tracks passed into Ninth avenue near the place where the deceased man

was last seen alive, while the smaller ones entered Riverside road, a thoroughfare leading into the city much further south.   Along the course of the larger tracks the pocketbook was found.   Along the course of the smaller tracks the keys were found.   At one point in the course of the smaller tracks, whoever made them had fallen down and floundered somewhat in the mud at a little stream he crossed, and there two of the grain checks were found.   Near this place a hurrying boy in knee trousers, wet and muddy to the waist, was seen.   The various tracks were measured repeatedly and they corresponded in size precisely with the shoes worn by the two boys.   At several points along the two lines of tracks boys were seen at an incriminating time of day, whom witnesses described and identified as Charles Betts and Clyde Moore, and when the latter was arrested, some days later, the coat which he had worn at Winfield on April 18 was found to be stained with blood which experts pronounced to be human blood.

Clyde Moore was charged with the crime, tried upon an information for murder in the first degree, convicted of murder in the second degree, and sentenced to confinement at hard labor in the penitentiary for twenty years.

In this appeal he claims the trial court committed grievous error in admitting over his objection evidence relating to the tracks made, course pursued, conduct exhibited, and appearance presented by Charles Betts subsequently to the commission of the crime.   At the scene of the murder human footprints were as relevant as pools of blood, and it was as proper to show the size, direction and characteristics of those which were found, and all the facts and incidents attending them, as it would have been to de-

lineate the conduct of the fleeing individuals who made them, had they been seen to leave the wagon containing the bleeding corpse. And when one set of the tracks·originating at the fatal place were traced practically without discontinuance or disconnection until they became identified with a certain fleeing boy, his demeanor and his immediate movements, made under the apparent stimulus of the crime, continued a part of the *res gestæ*, and could properly be shown. The course of the tracks made by Charles Betts, his accident at the creek and consequent befoulment, the finding along his trail of the articles rifled from the dead man's pockets, his haste, anxiety, and emotion, together with other evidence offered in the case, tended to characterize the homicide as felonious, to supply a motive, and to show that Charles Betts was one of the guilty parties. But they did not show Clyde Moore's connection with the crime. For this the state relied upon his presence at Winfield, his identification with one set of tracks leading from the scene of the murder, the finding of the pocketbook along the course of those tracks, the blood upon his coat, probably received in adjusting the body so that it could be searched, inconsistent accounts of his conduct, and other facts and circumstances disclosed by the record. Therefore, within the limits to which it was confined, the testimony offered was properly admitted.

Counsel for appellant refers to the familiar law limiting evidence of what is said and done by one conspirator, offered upon the trial of another, to acts and declarations made and done while the conspiracy was pending and in furtherance of the common design. But Moore was not prosecuted upon the theory that a conspiracy made him liable for the acts and declara-

tions of Betts, but was prosecuted upon the theory that he himself assisted in the perpetration of the crime and was guilty because of his own acts as principal.   The legal question presented is similar in all essential aspects to that in the case of *The State v. Peterson*, 38 Kan. 204, 16 Pac. 263, and the doctrine there announced is precisely applicable and fully controlling.

Since the evidence complained of was properly admitted, the criticism of counsel for appellant upon an instruction to the jury concerning it is not well founded and does not require extended discussion.

The appellant further feels aggrieved that the trial court refused to permit a question asked a witness by his counsel to be answered.   At a preliminary examination held to investigate if probable cause existed to hold Charles Betts for the crime, Clyde Moore was a witness.   In his testimony at that hearing Clyde Moore gave a detailed statement as to where he and Charles went and what they did while together, and as to where he went and what he did after they separated.   Upon Clyde Moore's trial, a witness who had heard this statement was produced and asked to repeat Clyde's story up to the point where he had stated he and Charles had separated.   Upon cross-examination, the witness was asked to proceed with the narrative, which he did to the fullest extent the examining counsel required.   After having apparently exhausted the witness as to everything Clyde had said he had done, counsel propounded this question: "You remember also that he testified that he had nothing, and knew nothing, about the killing of your father, do you not?"   The court refused to permit the question to be answered.   Clearly the ruling was not prejudicial.   The facts narrated made it impossible

for Clyde to have been connected with the killing in any way. Whatever of exculpation there was for him lay in the circumstances he had narrated. His answer to the question could not be explanatory or elucidative of anything he or Charles had done, and could not in any way fortify his position. He w.as exonerated, if at all, by the facts, and not by his own self-serving declaration of their force and effect. While the question was perhaps technically proper as cross-examination, it could not prejudice appellant's cause that he was precluded from saying he had asserted his innocence on the occasion of Charles Betts's preliminary examination.

"On an appeal, the court must give judgment without regard to technical errors or defects, or to exceptions which do not affect the substantial rights of the parties." (Gen. Stat. 1901, § 5731.)

At the trial the district court instructed the jury upon the law of murder in the second degree. The appellant now claims that the facts and circumstances disclosed by the evidence irresistibly compel the conclusion that the crime was murder in the first degree as charged in the information; that the verdict shows the jury to have been unwilling to convict of murder in the first degree; and hence that appellant was entitled to an acquittal, which was prevented by the unwarranted instruction. The evidence in the case was wholly circumstantial. No one saw the deed who could be used as a witness by the state, and in finding a verdict the jury were confined to an interpretation of the dumb memorials outraged nature herself preserved. This court is not prepared to say that a state of facts could not exist under the evidence involving purpose and malice but excluding deliberation and premeditation. There may have been a quarrel and the

larceny may have been an afterthought; and to support murder in the first degree it is necessary to attribute to the defendant an almost inconceivable depravity of mind.   Therefore, it was proper that the court should instruct the jury with reference to the less heinous degree.

Appellant finally claims that during the progress of his trial certain sensational newspaper articles concerning matters supposed to affect the case were circulated in the county, producing much public excitement, and he claims that something of this agitated state of feeling was communicated to the jury, to his prejudice.   The record, however, is barren of any proof of any such influence upon the minds of the jurors.   The affidavit used upon the hearing of the motion for a new trial does nothing more than state a belief that the public passion found its way into the jury-box.   The verdict cannot be overturned upon anything so lacking the equality of fact.

The appellant appears to have had a fair trial, and the judgment of the district court is affirmed.

All the Justices concurring.