THE STATE OF KANSAS v. GEORGE McANARNEY.

No. 14,182. (79 Pac. 137.)

SYLLABUS BY THE COURT.

1. HOMICIDE—*Instructions Respecting All the Degrees.* In a prosecution for murder, where there is no direct evidence of the manner of the killing, and the evidence introduced against the defendant is wholly circumstantial, and open to the inference by a jury that the offense committed may have been among the several lower degrees of that charge, it is the duty of the court, upon request, to instruct the jury respecting all the degrees of homicide, it being the province of the jury, and not of the court, to determine the degree, if any, of which the defendant is guilty.

2. ——— *Instructions in Case at Bar.* Herein it is *held,* that the evidence required the court to charge the jury respecting the first and fourth degrees of manslaughter.

3. ——— *Chemical and Microscopic Examination—Incompetent Expert Testimony.* Pieces of the trousers worn by defendant at the time of the alleged homicide were cut out, macerated, and a chemical and microscopic examination of the mixture made by an expert, to find whether there was blood on the garment. The expert testified that a minute quantity of blood was found. After the garment was taken from the defendant it was put into a sack with the bloody clothing of the deceased, and with other articles covered with blood, and all were carried together a considerable distance in a wagon, and kept together until the test was made. *Held,* that the result of the test was not admissible to prove there was blood on the garment when last worn by the defendant.

4. ——— *Essentials to the Admission of Expert Testimony.* Two things are essential to the admission of such evidence: (1) The identity of the thing analyzed and examined with that which is the subject of the inquiry; (2) that it has not been tampered or interfered with between the time when its condition is in question and the time of the expert examination.

5. ——— *Inadvertent Interference.* The inadvertent or accidental interference with the thing examined is just as destructive of the accuracy and fidelity of the expert examination, and the result as inadmissible, as though it had been intentional.

6. ——— *Insufficient Identification.* It is *held,* that a shirt about which testimony was given was not so identified or connected with the defendant as to make the evidence admissible.

The State v. McAnarney.

Appeal from Rice district court; JERMAIN W. BRINCKERHOFF, judge. Opinion filed January 7, 1905. Reversed.

C. C. Coleman, attorney-general, E. H. Lees, and Prigg & Williams, for The State.

Waters & Waters, David Overmyer, C. F. Foley, Samuel Jones, and O. E. Hopkins, for appellant.

The opinion of the court was delivered by

JOHNSTON, C. J. : About three o'clock of the afternoon of July 25, 1903, the dead body of James McAnarney was found in a well by his son, George McAnarney. At the conclusion of a coroner's inquest George was accused of feloniously killing his father with a tin can, and the result of a second trial was his conviction of murder in the second degree. There was no direct testimony connecting the defendant with the death of his father, and it is earnestly contended that the circumstantial evidence produced was not such as to warrant the court in submitting the case to the jury, or in approving the verdict returned.

The deceased was about seventy years of age, had been estranged from his wife, who owned the farm, and was then living at the home of a neighbor. His wife, a very frail woman, and a daughter, Bessie, lived together on the farm, but for a few weeks before the homicide they had been at the home of George, assisting him during the harvest season. The deceased had visited his wife occasionally and importuned her to share her property with him and furnish him support. These were wrangling and unpleasant meetings, which injuriously affected his wife, who was suffering from heart disease. He called at the house the day before the homicide, and on the forenoon of

the following day returned. George was in an adjoining field engaged with others in stacking wheat. Shortly before noon a boy, Willie McAnarney, ran out to the field and told George that Bessie had sent for him and to come at once. He did so, and found Mrs. McAnarney in a state of collapse as a result of a controversy with her husband. Just before George reached the house, James McAnarney left it, going toward the public road, and there was no testimony showing that he was afterward seen alive by any one. George sent a man to town for a doctor for his mother; Dillon, a hired man, was sent for a neighbor woman two and one-half miles away, and then George came to the house and assisted in caring for his mother. Subsequently, he ate dinner, did some chores about the house, met and talked with a number of people who called there, and by his testimony undertook to account for himself until about three o'clock, when he went on horseback to the well to oil a windmill, and, upon looking into the well, discovered that his father was lying in the water, face downward. Without further examination he rode to an adjoining field and notified neighbors that his father had drowned himself, and then on about a mile and a half, and notified his brother Ed. of the death of his father. During this time he was crying and exhibiting much grief, which brought out the remark from his brother, "Well, you need not be crying. You are all glad of it, and I am damned glad of it."

In the meantime his father's body had been lifted from the well, and the only wound of any consequence was a puncture in the neck, apparently made with a blunt instrument. It was a ragged wound, about two inches wide and three inches long, the tissue being crushed, and the entire trachea destroyed, except

the posterior wall.    In the well was found part of a
bloody handkerchief.    When George returned he was
told of the wound and condition of the body, and upon
the suggestion of Bessie he went to town to send no-
tices of the death to distant relatives, and to obtain
stimulants for his mother.    At the coroner's inquest
an examination of the conditions about the well was
made, and finally one of the party discovered a bloody
spot under a hedge about 213 feet from the well.    At
the same place there were found a small piece of a red
handkerchief, which appeared to be a part of the one
found in the well, a cane which the deceased had car-
ried, and also an old tin can, split from the top, the
cane and the can both being bloody.    These were found
under a heavy, rank hedge growing on the side of the
highway, the overhanging limbs being only about two
feet from the roots, and extending out seven or eight
feet, the ends touching the ground, and forming a
complete canopy over the spot.    Between the spot
and the well were another hedge, in which there was
an opening about eighteen inches wide, interlaced
with weeds and twigs, and a wire fence ; the well was
within a wire enclosure.    At the spot there was a lit-
tle blood found on the foliage, the weeds were some-
what bent and broken, but there was little, if any,
evidence of a struggle under the hedge.    Although
diligent search was made, no blood was found between
the hedge and the well, or about the platform of the
well.    No indications were found of the dragging of a
body under the wire fences, and it did not appear that
the clothing worn by George, or that upon his father,
had been torn.

There is a mystery about the death of McAnarney
which is not satisfactorily solved by the evidence in
the record.    Was it a case of homicide or suicide?

The defendant contends that the circumstances developed point most strongly toward self-destruction. Attention is called to his age and homeless condition, his estrangement from his wife and the hostility existing between them, his knowledge that his interview and action had caused her to faint and collapse ; that seeing them hurry messengers for a doctor and to secure the assistance of neighbors it probably occurred to him that she was about to die, and that his misconduct would be the cause of her death.   Full of self-reproach, as well as discouragement and despair, he crept under the heavy hedge, and, having no weapon with him, found the split can, and undertook to end it all by cutting his throat.   Failing to sever any of the main arteries or veins, and thinking the process too slow, he made his way to the well and dropped into the water.   This is said to be altogether more probable than that George, who had no motive to kill his father, should have taken his life.

The theory of the state is that the deceased's conduct toward his wife irritated and angered George, and that when he came into the house and learned that his mother had collapsed and was supposed to be dying, and heard that it was the result of something said or done by his father, and being told by his mother that the father should be punished, he undertook to punish him and to carry out a threat said to have been made a year before, that if the father continued to come around he would put him where he would not again bother them ; that after his mother had recovered somewhat, and, seeing his father over at the hedge, he went there, crawled under the hedge, attacked and killed him with the tin can that chanced to be lying there.   Later, he concluded to give the case the appearance of suicide and so returned to the

place, thrust his handkerchief into the wound to prevent the dripping of blood, carried or dragged the body through the fences to the well and threw it in. Afterward, he made an excuse of oiling the windmill, that he might discover and announce the so-called suicide of his father. The alleged threats of punishing the father, and the claim that he had a handkerchief like the one found in the well, the demand made at the inquest that he be given a fair show, before a charge had been made against him, some inconsistent and incriminating statements said to have been made by him, and the further claim that some blood had been found on his trousers, are referred to as tending to sustain the theory of the prosecution.

In behalf of the defendant it is said that there was an entire absence of motive to kill his father. There was no property to be inherited, and nothing to be gained by his father's death. Although there had been a disagreement between them a year or so before, he had since visited his father when sick, and even as late as the Sunday preceding his death, and during all this time their relations were not unfriendly. He accounted for his whereabouts between the time that his father left the house until the body was found in the well, and there were many people about to observe his movements. The public place chosen and the awkward and ineffective weapon, he says, negatives the theory of the state. Inquiry is made, if he was going to kill his father, Why did he select a place on the public road where people were passing and repassing? Why did he not use a knife, which he had in his pocket, or some other weapon than a battered tin can? Why would the father lie under the hedge while George crawled in to attack him? And why was there no evidence of a struggle, no blood on the

The State v. McAnarney.

foliage, and none on George's clothing? It is said that, if George had killed his father, and if he had dragged the body from the hedge through or under the fences to the well, there would have been a well-defined track and indubitable proof of it. It is said that it is an impossibility for him to have killed his father with the can and carried the body for more than seventy yards, without distinctly marking himself and the course taken to the well, and quite impossible to have done so without attracting the attention of some of the many persons who were about the premises at the time.

There are circumstances in the case which, to the court, seem quite inconsistent with the guilt of the defendant. It is not easy to discover a motive for the killing, nor to find satisfactory evidence that the defendant was connected with the death of his father. In the evidence, however, may be found some circumstances pointing toward the defendant, and we cannot say that they were insufficient to go to the jury, or that they did not tend to establish some degree of the offense charged. To undertake to weigh them would be an invasion of the province of the jury.

One of the claims of error is that the court declined to instruct the jury upon two degrees of manslaughter, which are included in the offense charged. The law with reference to murder in the first and second degrees, and of manslaughter in the second and third degrees, was given, but the court refused to advise the jury respecting the first and fourth degrees of manslaughter, and the refusal was based on the reason that the evidence did not warrant such instructions. In this we think there was error. It was a case where it was important to instruct upon every degree of homicide for which there was any support derivable

from the evidence. If it be assumed that there was a homicide, there was no eye-witness of it, and no one even saw the father and son come together where it occurred. Whether the defendant met his father casually or purposely, what was said or done by either before the conflict came on, who was the aggressor in it, whether the defendant went there to reprove or to kill, and the state of the defendant's mind at the time,. must all be deduced from circumstantial evidence alone. In such cases much is left to inference, and where the circumstances in evidence afford ground for an inference of a lower grade of homicide the court cannot safely refuse to instruct in such lower degree. So it has been repeatedly held that if there is slight evidence of a lower degree of an offense, although it may appear to the court to be weak and unsatisfactory, the question should be submitted to the jury, and a court is only justified in refusing to charge the jury on the lower degree of homicide when the testimony shows beyond question that the defendant is guilty of the higher offense. (*The State v. Patterson*, 52 Kan. 335, 34 Pac. 784; *The State v. Kornstett*, 62 id. 221, 61 Pac. 805; *The State v. Buffington*, 66 id. 706, 72 Pac. 213; *The State v. Moore*, 67 id. 620, 73 Pac. 905; *The State v. Clark*, 69 id. 576, 77 Pac. 287; *The State v. Knoll*, 69 id. 767, 77 Pac. 580.)

The statute provides:

"The killing of a human being, without a design to effect death, by the act, procurement or culpable negligence of another, while such other is engaged in the perpetration or attempt to perpetrate any crime or misdemeanor, not amounting to a felony, in cases. when such killing would be murder at the common law, shall be deemed manslaughter in the first degree." (Crimes Act, § 12; Gen. Stat. 1901, § 1997.)

In *The State v. Spendlove*, 47 Kan. 160, 28 Pac. 994,.

this section was interpreted, and it was held that the act or offense which the accused commits, or attempts to commit, at the time of an unintentional killing includes assault and battery, and that intentional violence to the person is not excluded.  If, therefore, without any design to effect death, George attacked his father, intending only to commit an assault and battery upon him, and in the use of the tin can which he chanced to pick up he unintentionally killed him, it would fall within the section quoted and constitute manslaughter in the first degree.  The slight evidence of motive to kill and the character of the weapon used give some support to this theory.  Since there was no direct evidence as to the facts attending the killing, the court cannot assume to decide what the facts are. The manner of the killing and the purpose of the defendant at the time are necessarily questions for the jury.  Did not the jury have the right to infer that George met his father at the hedge, and, intending only to administer punishment which would prevent future interference with the mother, committed assault and battery upon him without intending to kill him or perpetrate any felony?  Is not the case as open to this inference, as that there was premeditation in the killing ?  The court rightly instructed as to the elements of murder in the first degree, including premeditation, and he also presented the law of excusable and justifiable homicide.  In these matters the court did not assume to decide whether there was evidence of premeditation, malice aforethought, or facts which would justify or excuse the killing, but left them to the jury ; and there was no more reason for the court to decide that no facts existed from which the jury might infer that the offense was manslaughter in the first degree.

The elements of manslaughter in the fourth degree

were also present, and the jury should have been instructed with reference to the law of that degree. Counsel for defendant pertinently inquired, Did George and his father meet at the hedge and engage in a quarrel, and did George kill him in the sudden heat of passion? Did they engage in a fist fight, and did George crowd the father over onto the old tin can, and by falling on the tin can receive the wound from which he died? Is it not open to inference that they were engaged in a fight, and that in the course of the struggle the father was thrown or forced upon the jagged edge of the tin can lying there and involuntarily killed, George having no knowledge of the presence of the can, and no intention to either strike or wound the father with the can? If this were done by him in the heat of passion, and the assault was not justifiable, it would be difficult to say that a conviction of manslaughter in the fourth degree was without support. The circumstantial testimony, indefinite and uncertain as it was, required instructions under sections 26 and 27 of the crimes act (Gen. Stat. 1901, §§ 2011, 2012), giving the jury an opportunity to determine whether or not the defendant was guilty of manslaughter in the fourth degree.

Complaint is made of the admission of testimony of Doctor Stewart, an expert witness. He made an examination of the trousers worn by George McAnarney on the day of his father's death and stated that he found some corpuscles of blood on them. The result was obtained by cutting portions of the garment upon which there were spots, macerating them, and making a chemical and microscopic examination of the mixture. He found a minute particle of blood, but was unable to say that it was human blood. It was an *ex parte* examination, and none of the elements in-

The State v. McAnarney.

cluded in it were preserved.  There was no attempt to preserve the blood obtained, nor the solution in which it was found, and even the microscopic slides were destroyed.  Under these circumstances there was little opportunity to test the efficiency of the expert or the truth of his report.  A more serious objection, however, is that there is no assurance that the trousers were in the same condition when examined as when last worn by the defendant.  They were delivered to the officers and put into a gunny-sack, together with the bloody hat and clothing found on the deceased, and there were also placed with them the bloody tin can and cane found at the place of the supposed homicide.  So bundled together, the articles were carried over the country for miles, while the officers were driving about subpœnaing witnesses. After being kept with the bloody clothing for some time, and after the preliminary examination, the trousers were examined for blood corpuscles, and it would have been strange, indeed, not to find some, although they had been entirely free from any blood when placed in the sack.  Two things are essential to the admission of such evidence : First, the identity of the thing analyzed or examined with that which is the subject of inquiry ; and second, that it has not been tampered or interfered with between the time when its condition became a question and the time of the expert examination.  ( *The State v. Cook*, 17 Kan. 392 ; *State v. Garrington*, 11 S. Dak. 178, 76 N. W. 326 ; *State of Iowa v. Hossack*, 116 Iowa, 194, 29 N. W. 1077 ; Underh. Crim. Ev. § 318 ; Rog. Exp. Test., 2d ed., § 57 ; Whart. Crim. Ev. § 423.)

The case of *State v. Garrington*, *supra*, is somewhat analogous to this one.  Cloth was cut from the pocket of the overalls worn by the deceased at the time he

was killed. The pieces were cut from the overalls several weeks after the crime was committed, and an examination made by an expert, who testified that they contained blood-stains, but he was not able to say that the stains were caused by human blood. The purpose of the evidence was to show that the person who did the killing had rifled the deceased's pockets with bloody hands, and it was held that the time when the pieces were taken from the overalls and the manner in which the articles were handled created so great uncertainty as to what caused the stains as to deprive them of any evidentiary value.

It was highly important that the trousers of defendant should have been carefully kept, and, since blood was the object of the test, that they should have been kept entirely apart from blood or bloody articles. As they were in contact with the bloody articles and shaken together as the officers traveled for hours across the country, the result of the expert's examination proved nothing as to the condition of the trousers when they were laid off by the defendant. It was the action of the officers of the law, not of the defendant, that rendered the proof valueless. There is no claim by any one that the trousers were purposely interfered or tampered with, but the inadvertent or accidental interference with them is just as destructive of the accuracy and fidelity of the expert examination as if it had been intentional. Truth is the object of rules of evidence, and justice the object of judicial inquiry, but a rule allowing the result of such a test as against one on trial for murder would be more than likely to attain untruth and injustice. The contact and interposition of foreign matter made it impossible for the defendant, by any test or examination, to show the former condition of the trousers with respect to blood. It is unnecessary to determine

whether the *ex parte* examination, the destruction of the solution as well as of the blood found, rendered the evidence incompetent, but because the trousers examined were interfered and tampered with, the reception of the testimony and submission of the same to the jury must be regarded as prejudicial error.

Testimony was received in regard to a shirt found outside and near the defendant's house on the day after the alleged homicide, and on portions of which there appeared to be a pasty stuff of a reddish cast. Attention was specifically called to this testimony in the charge of the court. The shirt was not the one shown to have been worn by the defendant at the time in question, nor to have belonged to him. It was found after the *post mortem* examination, and after crowds of people had been about the premises for hours, but where it came from, how it came to be there, and what afterward became of it, do not appear. The shirt worn by the defendant was identified and produced at the trial, but the other one was not kept, nor introduced as evidence. The connection between the shirt and the defendant, or between it and the supposed homicide, was not sufficiently shown to make the testimony respecting it admissible. The pasty stuff which stiffened portions of the shirt was not shown to be blood, nor was there any critical examination made of it. The instruction of the court respecting the shirt gave the testimony sanction and importance, and it may therefore have had considerable weight in the minds of the jury.

Other questions have been discussed, some of which are unimportant, and others of them may not again arise in the case. For the errors mentioned, the judgment is reversed, and the cause remanded for another trial.

All the Justices concurring.