[Crim. No. 90.   Third Appellate District.—August 21, 1909.]

THE PEOPLE, Respondent, v. T. H. MUHLY, Appellant.

CRIMINAL LAW—MURDER—CONVICTION OF MANSLAUGHTER—CIRCUMSTAN-
TIAL EVIDENCE RECONCILABLE WITH INNOCENCE.—Where a defend-
ant charged with murder was convicted of manslaughter, with a
recommendation to the mercy of the court, wholly upon circumstan-
tial evidence, all of which was capable of reconciliation with the
innocence of the defendant, and some of which was equivocal and
of doubtful propriety, under such a state of the evidence the im-
portance of examining with care the rulings of the court objected
to by the appellant should be emphasized.

ID.—CIRCUMSTANTIAL EVIDENCE ADMISSIBLE.—Circumstances which may
have had some connection with the homicide were admissible in evi-
dence, notwithstanding they are obviously consistent with the inno-
cence of the defendant.

ID.—IMPROPER EVIDENCE—ARTICLES NOT TRACEABLE TO DEFENDANT.—
The court improperly admitted in evidence articles found upon the
premises, which might otherwise be accounted for, and were not
traceable to the possession of the defendant, and which left a scope
for prejudicial surmise against the defendant, in view of the well-
known fact that there is a general mental tendency, when a corporal
object is admitted to prove something, to assume on sight of it
what is asserted about it when admitted.

ID.—PREJUDICIAL INSTRUCTION—STATEMENTS OF DEFENDANT.—Where
there was conflicting evidence as to part of the defendant's state-
ments, and if the statements made by the defendant were believed
to be true, he was entirely innocent, it was prejudicially errone-
ous to omit part of an instruction requested by defendant as to the
danger of mistakes and misapprehensions of his statements by wit-
nesses, and without allusion to the evidence as to his statements,
to transform an instruction designed to afford defendant the bene-
fit of a friendly comment as to the infirmity of human testimony
into a hostile instruction, that "it is the law that verbal statements,
or, as they are sometimes called, extrajudicial statements, made by
the defendant out of court are to be received by the jury with
caution," thereby discrediting the defendant in the eyes of the
jury, and intimating that all statements made by him may be re-
jected as untrue.

ID.—MODIFICATION BY REJECTING MAJOR PART OF REQUEST—EXCEPTION.
Where a requested instruction is modified by rejecting the major
portion thereof favorable to the defendant, the modified instruction
is the court's, and subject to the same exception as if given without
any request therefor.

11 Cal. App.—9

APPEAL from a judgment of the Superior Court of Madera County, and from an order denying a new trial. W. M. Conley, Judge presiding.

The facts are stated in the opinion of the court.

Ernest Klette, and Frank Kauke, for Appellant.

U. S. Webb, Attorney General, and J. Charles Jones, for Respondent.

BURNETT, J.—The defendant was charged with murder and convicted of manslaughter, and the appeal is from the judgment and the order denying his motion for a new trial.

The evidence claimed to be inculpatory was entirely circumstantial, some of it equivocal and of doubtful propriety, and all capable of reconciliation with the innocence of the accused. That an atrocious murder was committed is indeed clear and is not disputed, but the guilty participation of appellant must have been a matter of grave doubt even to the jurors who rendered the verdict. Otherwise, the conviction of manslaughter with a recommendation to the mercy of the court seems unaccountable.

It appears that the deceased, James H. Bethel, for a number of years had resided on his premises in the foothills of Madera county, where he kept a wayside saloon or roadhouse. At the time of the homicide, and for several years prior thereto, appellant and the deceased were the owners as tenants in common of a tract of land of one hundred and sixty acres on which were located a dwelling-house, the said saloon and other buildings. For the preceding year defendant and his wife had been residing on said premises and deceased had been taking his meals with them at said dwelling-house, but he occupied as a sleeping apartment a portion of the saloon building. The house and saloon, about one hundred and seventy feet apart, were situated on the same side of a public road passing across the premises, the other buildings being on the other side of the road and some distance from the residence. From the statements made the next day by defendant, from the testimony of his wife at the trial and the description of the scene of the homicide given by vari-

ous witnesses, these facts are deduced: On the evening of
February 28, 1908, the deceased ate supper as usual with
defendant and a short time thereafter the former went from
the dwelling-house to the saloon. About the time he reached
the porch thereof, as near as can be determined, two shots
were fired from a shotgun, one of which struck the head and
face of the deceased and the other the wall of the saloon
building. Thereupon the skull of the deceased was crushed
by blows inflicted by some blunt instrument, from the effect
of which he died—presumably instantaneously. According
to the statement of defendant, which harmonizes with the
testimony of his wife, he was in the kitchen at the time the
first shot was fired, and he thereupon stepped outside the
door, heard a sound as of someone scuffling and some words
spoken by deceased and then the second shot was fired. The
defendant went back to his work in the kitchen and later in
the evening went over to the saloon to inquire concerning
the shots. He found Bethel's body lying on the ground at
the corner of the saloon porch. Early the next morning the
defendant notified a neighbor of the occurrence and about
ten days thereafter the former was arrested and charged
with the crime.

A brief recital of substantially all the circumstances which
might have been considered by the jury as evidence of de-
fendant's guilt will show the rather feeble foundation for
the verdict, and emphasize the importance of examining with
care certain rulings during the trial and an instruction given
by the court which are assigned as error by appellant. The
most significant circumstance in this connection is the dis-
appearance of defendant's shotgun, which there is some evi-
dence to show was probably used in the perpetration of the
crime. Diligent search for this gun was made on the prem-
ises immediately after the homicide and at various times
but without avail. Appellant made a statement at the coro-
ner's inquest to the effect that the gun was taken down to
the saloon on the day of the homicide to shoot quail and that
he had never seen it since. The coroner failed to reduce to
writing all the testimony, and there is some discrepancy be-
tween the statements of the witnesses as to whether appel-
lant said he or the deceased took the gun. Audie K. Wofford,
a member of the coroner's jury, testified that appellant said

that "Mr. Bethel came over in the forenoon and got the shotgun at that time. He said it was loaded when he gave it to him." The same witness declared: "I have seen Mr. Bethel use this gun more than once. I saw him shoot quail with it there."

Appellant's wife testified: "Mr. Bethel came over to the house during the afternoon. Mr. Muhly was in and out as usual. I was out in the kitchen. I did not see what he did or speak to him. I do not know what he came for, he was in and out a good deal of the time; sometimes he came for his tools and sometimes he came to get the shotgun to shoot quail." She further testified that "at the time of the shots Mr. Muhly was out in the kitchen. . . . When the shot was fired I stood up and I heard the screech and another shot and then I put the baby down and I started into the kitchen. I stepped out of the kitchen door and saw Mr. Muhly. I don't know where the gun was on that night. Mr. Muhly had nothing to do with that gun after or immediately before supper that I know of. After supper was eaten and Mr. Bethel got up and Mr. Muhly was in the dining-room Mr. Muhly did not have the gun that night or at any time. I have not seen the gun since." The jury undoubtedly discredited the foregoing statements. It cannot be said that this was entirely unjustified, since the jurors are the exclusive judges of the weight of the evidence and of the credibility of the witnesses, but there appears to be nothing unreasonable in the explanation of this circumstance given by the defense, especially in view of the undisputed fact that at times the deceased had the gun in his possession and would shoot quail from the saloon porch. And whatever may be said as to the probability that appellant murdered Bethel, it is clear that the prosecution produced no evidence—presumably because of its inability to do so—that Muhly on the evening of the homicide used or had in his possession this shotgun. The evidence further shows that it was the invariable custom of the deceased to leave the door of his saloon unlocked while he was taking his meals at the residence. Witnesses also testified that he had trouble with the Indians, and that he said he "expected to be killed by the Indians." Therefore, granting that this gun was the instrument of death, the conclusion of defendant's guilt is no more prob-

able than the view that while Bethel was at supper someone else took the gun from the saloon and, lying in wait for him, brutally took the life of the deceased.

The conduct and appearance of the defendant after the homicide probably also excited the suspicion and indignation of the jury.  There is no doubt, however, that his infant child was seriously ill and the wife, testifying as to what occurred immediately after the shooting, said: ''I came back into the house and I went back into the front room and he went back with me, after that he went back and finished up his work in the kitchen.  I remained in the front room, then after he finished up his work he came back in the front room; when he came back there was something said with reference to the noise or shooting, and after a while he went out to see if he could not find out what was the matter; he went out the front door; I don't know how long he was out, it was not very long, when he came back I asked him what was the matter.  He said, 'They have got him, he is lying there dead,' and I went to crying, I was frightened.  Mr. Muhly did not go anywhere that night; he wanted to go and notify the coroner and sheriff but I would not let him go; I was scared.  I knew that grandpa was killed and I was afraid, and just did not let him go, that was all.''  The jury may have concluded that the defendant's delay in communicating with others was indicative of guilt, but who can say that an innocent man under the same circumstances certainly or probably would have pursued a different course?

Some of the witnesses testified that after the homicide the defendant appeared to be nervous and excited and one of them said: ''He looked like kind of down—looked like he was guilty.''  Others testified that there was nothing unusual in his appearance.  It would not be surprising under the circumstances of suspicion if the defendant, whether guilty or innocent, was somewhat agitated; and this mental perturbation would probably exhibit itself so as to be observed by others, but it is clear that testimony concerning the same is so largely a matter of opinion and depends so much upon the temperament of the accused and of the observers as to be of very little value.

About forty days after the homicide, while the defendant was in the county jail, where he had been for one month, some

parties, under the direction of the district attorney, engaged in making additional search of the premises, found an old silk handkerchief buried under the manure in the barn. They also picked up at a short distance from the dwelling-house a number of pieces of overall cloth. Sometime in September another search was made and an old pair of shoes was found in a crevice of the rocks from one hundred to one hundred and fifty yards from the house. These articles were examined by a chemist, who testified that there were traces of blood on each, but it was impossible to tell whether it was human blood or not.

These articles were not traced to the defendant. It was not shown that he ever had any of them in his possession, and they were admitted over the objection of appellant. The evidence shows that the horses of other persons as well as those of appellant had been kept in the barn and numerous other parties had been there at various times. The defendant frequently wore blue overalls but the only positive evidence to identify the pieces of cloth was to the effect that they had been obtained from the granary by defendant's mother in law for the purpose of making rugs, and that they were never worn by defendant but had been left in the granary by teamsters who frequently slept there.

The only evidence offered to connect defendant with the shoes was the testimony of a so-called expert that the shoes were worn or run over in a manner similar to those admittedly belonging to defendant. There seems no doubt, however, that the shoes were two sizes smaller than those usually worn by the defendant, and the mother in law—however strange it may seem—testified positively that the shoes were hers, and she tells how they happened to be in the place where they were found. The only circumstance, therefore, lending color to the contention that these articles were in possession of appellant at the time of the homicide was the fact that they were found on his premises some time thereafter.

In *State* v. *McAnarney*, 70 Kan. 679, [79 Pac. 137], it is said by the supreme court of Kansas that "Testimony was received in regard to a shirt found outside and near defendant's house on the day after the alleged homicide and on portions of which there appeared to be a pasty stuff of a reddish cast. Attention was specifically called to this testi-

mony in the charge of the court. The shirt was not the one shown to have been worn by the defendant at the time in question nor to have belonged to him. It was found after the post-mortem examination and after crowds of people had been about the premises for hours; but where it came from, how it came to be there and what afterward became of it do not appear. The connection between the shirt and the defendant, or between it and the supposed homicide, was not sufficiently shown to make the testimony respecting it admissible.''

The evidence of identification was stronger in the case of *People* v. *Hill*, 123 Cal. 574, [56 Pac. 443], than in the case at bar. A certain stick was found by a witness about an hour after the affray and very near where the fight took place, and it appeared that the deceased was killed by being struck on the head with a stick, but the supreme court declared: ''The court also erred in permitting the club which McClure found in the corral to be received in evidence and exhibited to the jury. There was no evidence identifying the stick as the one with which the defendant struck the deceased or in any way connecting the defendant with it. But, as it is evident from the description of the physician that the blow could have been produced by any other large and smooth instrument, it was necessary that there should be some evidence identifying the stick as the one with which the blow was given before it could be offered in evidence. Otherwise the jury could only conjecture that it had been used by the defendant. (See Taylor on Evidence, sec. 557.)''

Of course, circumstantial evidence is admissible to trace the natural objects to the possession of defendant at the time of the homicide, but it must be admitted that here the jury ''could only conjecture'' that the said articles were upon his person at the time. Indeed, their probative force depends upon the conjecture, first, that these objects were in possession of defendant at the time of the homicide, and, second, that there was upon them the blood of the deceased.

On the day of the inquest an autopsy on the body was performed and the coroner took a bunch of keys from the clothing of the deceased and placed them in his own pocket. In the evening he handed them to one Charles N. O'Neal. The latter put them in his pocket and that evening he locked

the door of the saloon with one of the keys and on the next morning on going to unlock said door he saw what he took to be a small spot on the door key resembling a blood stain. The keys were received in evidence, leading the jury probably to conjecture that the defendant after killing the deceased obtained the keys from his pocket and therewith opened the door of the saloon. In our opinion the foregoing objects should not have been admitted in evidence, as the connection of defendant therewith was not sufficiently shown and there was too much scope for prejudicial surmise in view of the well-known fact that "there is a general mental tendency, when a corporal object is produced as proving something, to assume on sight of the object all else that is asserted about it."

The only evidence offered to show motive for the homicide was testimony of a deed of an undivided one-half interest in the one hundred and sixty acres of land made by the deceased to the defendant in the year 1904 and the sale of a portion of the land assessed to Bethel for the nonpayment of taxes, and the fact that it had not been redeemed, and, furthermore, the testimony of the witness Peabody to a conversation with defendant about a month before the homicide when the latter was plowing in a field where there had been a melon patch for several years. The witness said: "I asked him how it was that Jim wasn't raising any more melons there." He replied with an oath and said: "No, he wouldn't; just that. He said Jim told him he raised about $200 worth of melons there on that piece of ground but I don't know whether he raised them that year or the year before." He also said "he never would raise any more melons there, as near as I can recollect." The witness, though, admitted that the relations between him and defendant were not friendly. These circumstances may have had some connection with the killing and were properly admitted in evidence, but it is obvious that they are consistent also with the innocence of the accused.

The court was requested by defendant to give the following instruction: "*You are instructed that it is the law, that verbal statements, or as they are sometimes called extrajudicial statements, that is, statements made by the defendant*

*out of court are to be received by the jury with caution;*
and you have a right to consider that there is danger of mis-
takes from misapprehension of the witnesses; the misuse of
the words; the failure of the party to express his own mean-
ing; the infirmity of memory on the part of the witness at-
tempting to relate all of the conversation, and this rule
applies when only a part of the defendant's declarations at
the time are written down or remembered and proven.'' The
court gave only the portion in italics, and therefore the modi-
fied instruction is the court's and subject to the same excep-
tion as if given without any request therefor. (*People* v.
*Wong Sang Lung,* 3 Cal. App. 221, [84 Pac. 843] ; *People*
v. *Fitzgerald,* 156 N. Y. 253, [50 N. E. 846].)

The instruction was requested in view of the fact that the
various witnesses differed materially as to what the defend-
ant said the day after the homicide and at the coroner's
inquest concerning certain features of the case. The admoni-
tion therein contained is justified by general experience, and
is an elaboration of the principle announced for the guid-
ance of the jury in the Code of Civil Procedure, section 2061,
subdivision 4, that ''the evidence of the oral admissions of
a party (ought to be viewed) with caution.'' The whole in-
struction might well have been refused as argumentative and
an invasion of the province of the jury, but, as given, it
charged the jury to view with caution—not the evidence of
the statements, but the statements themselves, thereby dis-
crediting the defendant in the eyes of the jury. The prejudi-
cial effect is seen from the fact that if the statements made
by the defendant were to be believed, he was entirely in-
nocent. It is too clear for argument that the defendant was
entitled to have his credibility determined by the jury with-
out any adverse suggestion from the court. It is readily seen
that, by the modification of the court, an instruction de-
signed to afford to defendant the benefit of a friendly com-
ment as to a universally conceded infirmity of human
testimony is transformed into a hostile intimation that the
defendant's statements concerning the transaction should be
rejected as untrue.

It may be that this was the decisive factor in an admittedly
close case. At any rate, the judgment cannot be sustained

without virtually holding that the jury disregarded the instruction of the court and that as far as objectionable, therefore, it caused no injury to appellant.    This we are unauthorized to do.

The judgment and order are reversed.

Hart, J., and Chipman, P. J., concurred.