No. 19,118.

THE STATE OF KANSAS, *Appellee*, v. GUY CURTIS, *Appellant*.

SYLLABUS BY THE COURT.

HOMICIDE—*Instructions on Lower Degrees of Offense Charged —Failure to Request—No Waiver — Province of Jury.* In a trial for murder, aside from proof of a few collateral circumstances, the evidence consisted of testimony of a previous confession of the defendant and the testimony of the sole eyewitness of the shooting. The information in one count charged murder in the first degree perpetrated in an attempt to rob, and also murder in the first degree independent of an attempt to rob. Aside from the confession the evidence was insufficient to sustain the charge of murder in an attempt to rob. The defendant testified at the trial that the confession was untrue and gave testimony that he had nothing to do with the crime and knew nothing about it, and gave testimony tending to prove that the confession had not been freely or voluntarily made. The prosecution offered testimony tending to show that it had been so made. This conflict in evidence was submitted to the jury with instructions not challenged here and the alleged confession was read in evidence. The jury were instructed "that under the evidence and the information in this case . . . the defendant is either guilty of murder in the first degree or he is not guilty." It is *held*, (1) Upon the charge of murder in the first degree, apart from the allegation of an attempt to rob, the jury should have been instructed upon the lesser degrees if there was any evidence, although slight, tending to show any lesser offense included

in the principal charge. (2) The evidence, apart from the confession, was sufficient to require instructions upon the lesser degrees. (3) Upon the confession alone, considered as an entirety, and entirely true, instructions upon the lesser degrees were unnecessary. (4) It was the province of the jury to believe or disbelieve all or any part of the evidence of the confession, and to accept as proof of guilt, or to reject, the confession or any part of it. (5) · The instruction complained of was erroneous, and upon all the testimony the error appears to have been prejudicial to the substantial rights of· the defendant. (6) Upon the circumstances stated in the opinion, the defendant did not waive the error by failing to ask for further instructions, the attention of the court having been directed to the matter which such requests would have called attention to.

Appeal from Sedgwick district court, division No. 2; THORNTON W. SARGENT, judge. Opinion filed January 9, 1915. Reversed.

*S. B. Amidon, Jean Madalene, J. A. Brubacher,* and *James Conly,* all of Wichita, for the appellant.

*John S. Dawson,* attorney-general, *George McGill,* county attorney, *Ross McCormick,* and *W. A. Blake,* both of Wichita, for the appellee.

The opinion of the court was delivered by

BENSON, J.: The defendant appeals from a· conviction of murder in the first degree. The principal error alleged is in an instruction to the jury that the verdict must be for murder in the first degree or not guilty.

The information in one count charges murder in the first degree by willful, deliberate and premeditated shooting, and murder committed in an attempt to rob, which is murder in the first degree whether deliberate and premeditated or not. The statute is:

"Every murder which shall be committed by means of poison or by lying in wait, or by any kind of willful, deliberate and premeditated killing, or which shall be committed in the perpetration of an attempt to perpetrate any arson, rape, robbery, burglary, or other felony, shall be deemed murder in the first degree." (Gen. Stat. 1909, § 2494.)

It will be seen that murder is in the first degree when committed (*a*) by poison, (*b*) by lying in wait, (*c*) by any kind of willful, deliberate and premeditated killing, or (*d*) in the "perpetration of an attempt to perpetrate any . . . robbery . . . or other felony." The construction of the phrase in quotation marks suggests a possible change in revision or compilation. In the corresponding section in the Compiled Laws of 1862 (ch. 33, § 1), the word "or" appears in place of "of," as printed in the General Statutes of 1868 (ch. 31, § 6) and of 1909, but the latter omits the word "other" between "any" and "kind," found in the General Statutes of 1868. These matters, however, are unimportant, at least in the present inquiry.

Counsel for the state say in their brief that the legislature "has seen fit to make a legal presumption . . . that a homicide committed, perhaps unintentionally, or accidentally, or unwittingly, in the perpetration of an attempt to perpetrate a robbery, shall be *deemed,* that is, shall be considered or regarded as, murder in the first degree."

The conclusion thus stated is not justified. The statute reads "every murder," not "every homicide," and malice aforethought is essential to murder in either degree. (*Craft v. The State of Kansas,* 3 Kan. 450, 482; *The State v. Ireland,* 72 Kan. 265, 83 Pac. 1036.) While murder committed in an attempt to rob is deemed murder in the first degree, the general charge of murder in the first degree, not alleging an attempt to rob, includes murder in the second degree and manslaughter. In a case where the general charge is made the court is required to instruct the jury concerning every lesser degree to which the evidence applies, and evidence includes all reasonable inferences from direct testimony. (*Brown, Adm'r, v. A. T. & S. F. Rld. Co.,* 31 Kan. 1, 1 Pac. 605; *The State v. Demming,* 79 Kan. 526, 100 Pac. 285.) But where the evidence shows beyond question that a defendant is either guilty of murder in the

first degree or innocent, it is unnecessary upon the general charge of murder in the first degree to instruct the jury upon any other degree. It follows that the sufficiency of the instruction complained of must be determined by the evidence. If, however, there is even slight evidence tending to prove a lesser degree an instruction is erroneous which restricts the jury from finding a verdict accordingly. (*The State v. Patterson,* 52 Kan. 335, 34 Pac. 784; *The State v. Buffington,* 66 Kan. 706, 72 Pac. 213; *The State v. Moore,* 67 Kan. 620, 73 Pac. 905; *The State v. Clark,* 69 Kan. 576, 77 Pac. 287; *The State v. McAnarney* 70 Kan. 679, 685, 79 Pac. 137; *The State v. Newton,* 74 Kan. 561, 87 Pac. 757.)

The principal evidence of the prosecution consisted of a previous confession of the defendant, which he repudiated at the trial, and the testimony of an eyewitness.

The defendant has been a resident of Wichita since 1910. On the 25th day of February, 1911, he was living there with his father. He was then 18 years of age. Burton M. Reed was killed on the evening of that day while walking with his little daughter on a street in Wichita. On October 20 of that year the defendant returned from Oklahoma, where he had worked as a farm hand since the preceding August. Soon after his return he was suspected of having some complicity in killing Reed, and being so accused he stated that Benton Houston had killed him; that he heard the shot and saw Houston running away with a smoking gun in his hand. The testimony of the defendant, given on the trial in this case, tended to show that these statements were not voluntary and free, but were made through fear and to avoid arrest. On the other hand, the testimony of the state tended to prove that his declarations were voluntary and not made under restraint, compulsion, or fear. The defendant was discharged without trial. Houston was also arrested for

The State v. Curtis.

the crime, but discharged at the preliminary examination, when the defendant was immediately rearrested and placed in jail. While there, in the presence of the chief of police, the county attorney, a stenographer, and one, perhaps two, other persons, a confession was made, taken down in shorthand, and transcribed as follows:

"Houston came up to my room, on Saturday, sometime I think it was and wanted to go out and get some money some way, and I asked him how he wanted to get it, and he said he wanted to stick somebody up and wanted to know if I would go with him, and I asked him when and he said we had better go right now. He came to my house sometime that evening and we went up to Schnoor's Cigar Store, and played a game or two of pool there. From there we went up North Topeka eight or ten blocks, and did n't see any one and we came back down Main Street to the Phister Pool Hall. We stayed in there until about eleven o'clock, somewhere near there and we went up to Topeka Avenue and went south to the second block on the south corner and he looked and seen this couple across the street, and wanted to know if we could get them, and I told him it did n't make any difference to me, and they were on the east side of the street, and we were on the west, and we got ahead of them and came across the street where that building was going up and we got in behind that tool house, and he handed me his gun and wanted me to hold the gun while he got the money. I told him that I would n't do it and I gave his gun back to him, and he said he would, and I started around the tool house and got possibly nearly around it and I heard this shot fired and he came around the tool house and went up the street. When I seen him run, I ran too. I went to the next corner north, and he turned and got on the sidewalk, and I went up the street and caught up with him in the next block on Emporia Avenue, and we walked on up to my room at 331 South Emporia. We stayed in there and talked about ten or fifteen minutes, and he wanted to leave his gun there with me that night and I took his gun and put it away and he went on home to the Hamilton Hotel. He came up to 331 South Emporia the next morning and wanted to borrow five dollars on his gun

and watch and he said 'all right,' and he said he would have the money in about a week. The next Thursday I went to the Hamilton Hotel and asked for him and they said he had left there. That's about all there is to it."

Answering questions of the county attorney, the defendant said that the statements he had given previous to the first arrest were untrue. He made some other answers in harmony with and perhaps emphasizing the confession above recited, but these answers are not deemed material to the present inquiry.

The daughter of the victim, a girl ten years old when the shooting occurred, who was with her father at the time, testified:

"We started to walk home after ten o'clock on South Topeka street, and got to about the tenth block, near Gilbert street. No one was with my father but myself. We walked on the east side of the street and passed no one going down Topeka avenue to Gilbert street, and no one passed us going north. Gilbert street runs across Topeka avenue east and west. The Grace M. E. church and the tool house were on the corner of Topeka and Gilbert streets on the side that we were walking. The church was being constructed and the building in which they keep their tools is just a little tool house. They were on the north side of Gilbert street and east of Topeka avenue. A sidewalk runs between the church building and the tool house. The tool house stood on the parking between the street and the sidewalk. My father was walking on the inside, next to the church, and I was walking on the outside. If any one had turned around us next to the street as we walked in that block I would have noticed them. We did not meet any one. As we arrived near the corner of Topeka and Gilbert streets, where the tool house was, a man stepped out from the south end of the tool house, said a few words and shot. I don't know what he said. We were almost to the south end of the tool house at the time the man stepped out. I noticed the gun that he had; it looked to me like a new one—shiny. It was a short pistol; I did n't notice how he held it. The first I noticed it was when it was fired and it was pointed at my papa. Papa was north a little bit of the man who fired the shot, and I was

still standing on the west side of papa when the shot
was fired. After the shot was fired papa moaned and
fell over onto his face. The man who fired the shot
ran around the south end and on the west side of the
tool house and north on Topeka avenue just as far as
I could see him. I could n't tell whether or not he
came back from the street to the sidewalk but could
hear him running just a few steps. He turned and
ran just as soon as he fired the shot."

At the trial the defendant testified that his con-
fession was untrue, that he knew nothing of the shoot-
ing of Reed and had nothing to do with it. Without
giving the language or details, it is sufficient for the
present purpose to say that he also gave testimony
tending to prove that the confession was obtained by
unfair means, while the evidence offered by the state
tended to prove that it was made freely and volun-
tarily. Upon this conflicting evidence, which we need
not discuss, the confession was admitted in evidence,
and submitted to the jury upon instructions which will
be referred to again. Their sufficiency, however, is
not challenged in the argument.

It will be noticed that in the testimony of the only
person who witnessed the tragedy there is nothing
tending to prove a robbery or attempt to rob, but only
the fact that the fatal shot was fired immediately fol-
lowing a few words which were not understood by the
witness. If this were the only evidence offered in
support of the charge of murder in an attempt to rob,
that particular charge could not be sustained; it must
therefore stand or fall upon the evidence of the con-
fession. On the charge of murder in the first degree,
independent of any attempt to rob, the degree of crime
could not be determined by the court but should be
left to the jury, under the statute and all the decisions
of this court upon the subject. The only theory upon
which the instruction that the defendant must be con-
victed of murder in the first degree or acquitted could
be based is that the crime was committed in an attempt

to rob, the proof of which rests entirely upon the evi-·
dence of a confession. This confession, it must be .re-
membered, was not made to the court or jury, but was
related by witnesses as statements they had heard him
make.

If the jury were bound to believe the evidence of the
confession in its entirety, or reject it altogether, the
instruction would be easily sustained, but they were
not. It is elementary that jurors are exclusive judges
of facts, whether established by evidence of a confes-
sion or otherwise. It might be said that there is no
good reason for accepting a part of the confession as
true and rejecting another part, but that was for the
jury to determine. It frequently happens that the
statement of a witness, although relating only to a
single matter, is believed in part and disbelieved in
part, for reasons inherent in the narration or appear-
ing in collateral circumstances, some of the testimony
being given ready credence, and some as readily re-
jected. It is the right of the jury to believe or disbelieve
a witness in whole or in part. Not only is the weight
of the testimony of any witness for the jury, as they
are usually told in the instructions, but the weight of
every part is equally for their determination. It seems
unnecessary to cite authorities on this proposition, but
they are close at hand. In *The State v. Kittle,* 70 Kan.
241, 78 Pac. 407, after referring to the duty to instruct
on inferior degrees, it was said:

"In behalf of the state it is argued that the de-
fendant's own version of the affair was either true or
false; that if it was true he was innocent of all offense
and should have been acquitted, while if it was false
he was guilty to the full extent of the accusation
against him. The fallacy of this argument lies in the
assumption that the defendant's narrative must be ac-
cepted, as either wholly false or wholly true, whereas,
in fact, it may have been a combination of truth and
falsehood." (p. 242.)

The same principle was applied in *The State v. Jack-
ett,* 81 Kan. 168, 171, 105 Pac. 689, where it was

stated that the jury were not bound to treat the defendant's testimony as wholly false or wholly true, for it in fact might be partly false and partly true. This is equally true of a confession.

There is another aspect of the case which should be considered. The jury were warranted upon the instructions of the court in rejecting the confession altogether. They were told:

"It is for you to determine for yourselves whether the alleged confession of the defendant was made freely and voluntarily without any influence of hope or fear. If so, you may consider it. If not, it is no evidence. Any menace or threat, or any hope engendered or encouraged that the prisoner's case will be lightened or more favorably dealt with if he will confess is enough to exclude the confession, thereby superinduced, from your consideration."

The jury may have so excluded the confession, and based their verdict on the testimony of the eyewitness and the talk of the defendant which led to his first arrest, given in evidence on this trial, in which no reference was made to any robbery or contemplated robbery. To meet such possible finding of the jury instructions might have been given to the effect that a murder committed in an attempt to rob was murder in the first degree, but in the absence of such an attempt the jury should determine the degree, appropriate instructions being also given defining such degrees. This phase of the case, possible under the evidence, was excluded from the consideration of the jury by the instruction complained of.

It is suggested in behalf of the state that the failure of the defendant to request instructions upon the inferior degrees waived any error in the instruction objected to. In deciding this question of waiver the language of the instruction should be considered. It was:

"That under the evidence and the information in this case . . . the defendant is either guilty of

murder in the first degree or he is not guilty, and you should return the verdict either that he is guilty of murder in the first degree as charged and set forth in the information or that he is not guilty; but whether he is guilty or not is for you to determine from the evidence and the instructions given you in this case."

It will be seen that this was not merely an instruction upon the constitutent elements of murder in the first degree, omitting mention of other degrees. If that had been the case, the contention that request should have been made for instructions upon other degrees would have more weight. The jury were told that the defendant was guilty in that degree or not guilty at all. Thus the attention of the court was already directed to the very matter which requests for instructions upon other degrees would have called attention to. The discussion of this matter, with a review of previous decisions, in *The State v. Winters,* 81 Kan. 414, 105 Pac. 516, sufficiently shows the views of the court upon the question of waiver. It was there said:

"From all the decisions noted it may be concluded that the statute means what it says and should be followed, but that a duty rests on counsel for the defendant to aid and not to ambush the court, and consequently instructions should be requested covering all lesser degrees or lesser crimes involved in the main charge which the defendant desires to be considered. A request sufficient to direct the mind of the court to the subject is enough. Good instructions need not be offered, or a good theory for them formulated; and the evidence itself may point so plainly to the necessity for such instructions that no request is necessary." (p. 421.)

A request for instructions upon the lesser degrees, which the court by this instruction held not applicable, would only direct attention again to a matter considered and acted upon. There was no ambush.

It is concluded that the district court erred in giving the instruction complained of, and that the error was

prejudicial to the substantial rights of the defendant. Having so concluded, it is not necessary to consider other assignments of error which involve matters not likely to arise upon another trial.

The judgment is reversed, with directions to grant a new trial.